[No. S093765. Mar. 20, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH EARL GAY, Defendant and Appellant.

**COUNSEL**

Therene Powell, under appointment by the Supreme Court; Lynn S. Coffin and Michael J. Hersek, State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—After a joint trial before separate juries in the Los Angeles County Superior Court, Raynard Paul Cummings and defendant Kenneth Earl

Gay were convicted of the June 2, 1983, murder of Paul Verna, a Los Angeles police officer. The juries found that Officer Verna was intentionally killed while engaged in the performance of his duties (Pen. Code, § 190.2, subd. (a)(7)), that the murder was committed for the purpose of preventing a lawful arrest (*id.*, § 190.2, subd. (a)(5)), that a principal was armed (*id.*, § 12022, subd. (a)) and that each principal personally used a firearm in the commission of the murder (*id.*, §§ 12022.5, subd. (a), 1203.06, subd. (a)(1)). Each jury returned a penalty verdict of death.

On direct appeal, we reversed Gay's convictions for robbery, attempted robbery, and conspiracy to commit robbery because of instructional error but otherwise affirmed the judgments against both Gay and Cummings, including the death judgments. (*People v. Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1].) While that appeal was pending, defendant Gay filed a petition for writ of habeas corpus. After issuing an order to show cause on the claim of ineffective assistance of counsel at the penalty phase and ordering a reference to resolve disputed questions of fact, we determined that defendant had not received constitutionally adequate representation, granted the petition, and remanded for a new penalty trial. (*In re Gay* (1998) 19 Cal.4th 771 [80 Cal.Rptr.2d 765, 968 P.2d 476].)

Upon retrial, the jury again returned a verdict of death, and the trial court entered judgment accordingly. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We find that the trial court erred at the penalty retrial in barring defendant from offering significant mitigating evidence concerning the circumstances of the murder—in particular, evidence that Raynard Cummings fired all of the shots—and in instructing the jury not only that a prior jury had found defendant guilty of murdering Officer Verna by personal use of a firearm, but also that it had been "conclusively proved by the jury in the first case that this defendant did, in fact, shoot and kill Officer Verna" and that the jury was to "disregard any statements . . . and . . . any evidence to the contrary during the trial." Having carefully reviewed the record, we conclude that the errors were prejudicial and that the judgment of death should again be reversed and the cause remanded for a second retrial on the issue of penalty. (See *People v. Terry* (1964) 61 Cal.2d 137, 142–147 [37 Cal.Rptr. 605, 390 P.2d 381], overruled on other grounds in *People v. Laino* (2004) 32 Cal.4th 878, 893 [11 Cal.Rptr.3d 723, 87 P.3d 27].)

### BACKGROUND

Officer Paul Verna was shot and killed by defendant and Raynard Cummings after Verna had stopped the car in which they were passengers for

a traffic infraction in the Lake View Terrace district of the San Fernando Valley region of Los Angeles. The prosecution's theory was that defendant and Raynard Cummings, passing one gun between them, shot and killed Verna so as to avoid arrest for a series of robberies that the two men, along with Pamela Cummings (who was then Raynard's wife) and Robin Anderson (who was then defendant's wife), had committed in Los Angeles County in the weeks preceding the traffic stop.

*Evidence Concerning the Robberies Preceding the Murder*

The two couples began socializing early in 1983. Pamela Cummings, who had met Raynard Cummings in high school and subsequently wrote letters to him while he was in prison in Delaware, became his girlfriend upon his release on parole in February 1983. Robin Anderson met defendant in March 1983, after *his* release on parole, and was introduced to Pamela and Raynard a short time later. The two couples had a double wedding in Las Vegas on May 12, 1983.

Neither defendant nor Raynard Cummings had a job. Their preferred pastime was engaging in robberies, unusually brutal ones. Pamela often drove them, in Robin's green car, to the targeted business and acted as a lookout, and Robin sometimes accompanied them. They regularly used a particular seating arrangement in the car to avoid drawing attention to the fact that the Cummingses were a mixed-race couple. Defendant, who had a light complexion (his mother was White and his father was Black), sat in front with Pamela, who was White; Raynard, who was Black and was noticeably darker than defendant, sat in the back.

The prosecution introduced evidence of four such robberies.

The first one occurred at Kenn Cleaners in Granada Hills. After closing time on the evening of April 25, 1983, Raynard Cummings entered the shop with a gun in his hand and ordered owner Hagop Parunyan and another employee, Lisa Pina, to get on the ground and count to a thousand. Raynard took the money from the cash register, hit Parunyan in the neck with the gun for not counting slowly enough, and left. Meanwhile, another man outside the cleaners had stuck a gun behind the ear of Parunyan's brother-in-law, Shahan Somounjian, forced him down to the ground, and stole his wallet. The man then used the gun to beat Somounjian about the head several times, breaking Somounjian's finger as Somounjian attempted to use his hands to protect himself. Somounjian could not identify his assailant, but a witness, Todd

Husk, who spotted a woman waiting inside a car and two men exiting the area near the cleaners, identified defendant as one of those men. Husk's friend, Troy Gann, identified the other man as Raynard Cummings. Pamela Cummings confirmed that defendant and Raynard had committed the robbery at the cleaners. Raynard had taken $200 to $300 from the cash register, and defendant had hit a man over the head with a gun. Pamela had acted as a lookout.

On the evening of May 13, 1983, defendant and Raynard Cummings entered a recreational vehicle repair shop in Reseda. The shop was closed and the owner, Richard Hallberg, was alone. Defendant demanded money from Hallberg at gunpoint and hit him repeatedly over the head with a revolver. So did Raynard. They hit Hallberg so hard the gun broke. Defendant stole a buck knife and about $1,600. Hallberg suffered injuries to his face, ear, and hands. He identified defendant in court but not in any lineups. Pamela confirmed that defendant and Raynard committed this robbery.

On May 20, 1983, Raynard Cummings entered Desire Florists in Chatsworth. He approached Carmen Rodriguez, the owner, and forced her into her office with a knife. When defendant walked in, he told Rodriguez not to look at him and struck her in the head with a gun. Defendant threatened to kill her if she did not open the safe, but Rodriguez was having trouble remembering the combination because of the blow to her head. She begged for more time, explained there was nothing in the safe, and asked the men to take her jewelry and the money from the cash register. Before leaving, Raynard instructed defendant to shoot Rodriguez. Defendant ordered Rodriguez to get on the floor and said, "I hate to do this to you." Rodriguez begged him not to kill her. Defendant beat her with his fists and with the handle of the gun before leaving the store. Rodriguez suffered a concussion and received stitches over several parts of her head as well as her finger. She also experienced deficiencies in her memory that caused her to close her shop. Brett Sincock, who owned a nearby store in the shopping center, saw the two men leave Desire Florists and get into the green car driven by Pamela Cummings. Pamela testified that defendant and Raynard thought it was "funny" that Rodriguez had attempted to resist.

On May 21, 1983, all four participated in a robbery at Artistic Mirror & Bath in Tarzana. Pamela Cummings and Robin Anderson entered the store first, around 5:00 p.m., asked what time the store closed, and left without buying anything. They were casing the store, looking for security buttons and cameras. Half an hour later, around closing time, defendant came to the back

door of the store and asked for "Epsom salts." Jeremy Glick, an owner of the store, said he had "bath salts" and let defendant inside. Defendant ordered Joyce Glick, Jeremy's mother and a co-owner, to the ground by placing a gun to the back of her neck. Then Raynard Cummings entered the store, held a switchblade against Jeremy's neck, and forced him to the floor, too. After telling the Glicks several times they would be killed if they said or did anything, the men went through Joyce's purse, where she had put the day's receipts, and removed the money. Defendant also took some jewelry from her person. Before the men left, defendant told the Glicks to stay facedown and count backwards from a hundred. Pamela testified that defendant gave her a ring he had stolen during this episode, although she had testified at the prior trial that Raynard had given her the ring.

### Evidence Concerning the Murder of Officer Verna

On June 2, 1983, Officer Verna of the Los Angeles Police Department was part of a motorcycle team assigned to traffic enforcement in the northeast quadrant of the San Fernando Valley. Verna told Sergeant James Leiphardt that he was going to enforce the stop sign at Gladstone Avenue and Van Nuys Boulevard. Verna said he had grown up in that neighborhood and that his parents had moved away only two years earlier. The last thing Leiphardt said to Verna was "Be careful."

Nine-year-old Martina Ruelas saw Officer Verna that evening. She lived on Hoyt Street near Gladstone Avenue. Sometimes Verna would stop to chat, and she liked him. Around 5:30 p.m., he told her he was going to stop and issue a ticket to a car coming down Gladstone from Van Nuys toward Hoyt Street. He instructed Martina to stay where she was, inside the fence surrounding her home. Verna turned on his red lights. The gray-and-black two-door Oldsmobile Cutlass turned onto Hoyt Street and stopped.

The Cutlass was driven by Pamela Cummings. As usual, defendant was in the passenger seat and Raynard Cummings was in the backseat. The car was stolen and had stolen license plates. A week earlier in North Hollywood, Raynard, acting alone, followed Linda Smith into her house after she had parked the car, pointed a gun at her head, and took her car keys. Pamela subsequently "swapped" license plates with another Cutlass in a mall parking lot. At the time of the stop, the three were on their way to purchase some marijuana in the area. When Pamela saw the officer, defendant told her to relax, it was just a ticket.

Despite defendant's words, Pamela got out of the car to meet Officer Verna because she was "afraid." They were in a stolen car with a gun[1] under the front passenger seat, and Pamela did not have her driver's license. Verna asked her for her identification and registration. When she said that she did not have the registration, Verna went up to the car and peered inside. He came back to her and asked who was in the car. Pamela answered that her husband was in back, and her cousin was in front. When the officer went back to the car and bent down to talk to the men, Pamela saw a gun barrel come around the headrest and then heard a shot. Verna grabbed his shoulder and turned towards her. Pamela testified that she could not see who was holding the gun, but the parties stipulated at the retrial that Raynard Cummings had fired the first shot.

Pamela testified she saw defendant slide across the front seat and exit the car through the driver's side. He shot the officer in the back and angrily said, "Take this, you motherfucker." Officer Verna fell to his knees and seemed to be reaching for his gun, but his holster was empty. Defendant stood over the officer, fired a couple more times, and threw the gun down at the officer in an angry manner. Defendant yelled at Pamela to get into the car. She did so and slid over to the passenger side. Defendant got back in the car and drove down Hoyt Street, away from Gladstone Avenue. When they realized that they had left the murder weapon as well as Pamela's identification, defendant turned around. Pamela testified that defendant picked up one or both guns and possibly her check-cashing card, which she had offered to the officer as identification. Defendant got back in the car and continued down Hoyt Street to Gladstone Avenue.

Pamela testified that only seconds elapsed between the first and second shots. Defendant was about three to five feet from Verna when he fired the second shot, which went into Verna's back, as did the next two. The last two shots were fired when Verna was on the ground.

A number of people witnessed the shooting. Some of them testified at the penalty retrial.

Robert Thompson was on a ladder, scraping old paint off the trim of his Hoyt Street home, when he heard a police siren and saw a gray car come around the corner from Gladstone Avenue and stop. Thompson saw two White people in front (a woman and a man) and a Black man in the back. The woman, later identified by Thompson as Pamela Cummings, promptly got out of the car and talked to the officer. She came back to talk to the front

---

[1] Earlier in the day, Raynard had used the gun to threaten his sister-in-law's boyfriend. Raynard had the gun in his possession most of the time.

passenger, apparently about the vehicle's registration, and gestured to the officer to signal that she did not have it. After the officer reached in to remove the car keys, Thompson resumed work on the house. Suddenly, he heard a sound that was unlike the echo caused by his work on the gutter. He turned around and saw the officer backing away from the driver's side of the car, holding his chest. The man in the backseat was pointing a gun at the officer with an arm extended out of the car.

Thompson quickly got down off the ladder and sought cover under the yucca trees in his front yard. He saw the front seat passenger, who he had initially thought to be White but who appeared on further inspection to be of mixed race, standing up and pointing a .22-caliber revolver at the officer. Smoke was coming from the weapon as the officer fell. The passenger then stood over the officer, feet straddling the officer's waist, and pointed the gun at the officer's chest and fired. Thompson went into his house to call the police.

On the night of the murder, Thompson told police that the Black man in the backseat, wearing a brown short-sleeved shirt, forced open the car door, continued to fire while exiting, and fired the last round at point-blank range. Thompson did not identify defendant in a lineup four days after the murder and instead identified two Black males with dark complexions.[2] Before the grand jury, Thompson said again that the medium-complexioned Black man in the backseat got out of the car with the gun and fired at the officer. Thompson did not publicly identify defendant as the passenger or the shooter until the preliminary hearing, almost three months after the murder. Thompson also identified Pamela Cummings as the driver and Raynard Cummings as the backseat passenger. In an interview with defense counsel prior to this retrial, Thompson returned to his original statement that it was Raynard Cummings who had exited the car and fired the shots. At the retrial, Thompson said he lied to defense counsel because he did not want to talk to them. Thompson also said that he considered defendant to be a "medium" shade of Black, although he had thought defendant was White before he exited the car. Thompson testified that the murder had been haunting him for 17 years, that the case had changed him into a person he did not want to be, and that this part of his life had been "ruined" by defendant and Raynard Cummings.

In the house next door to Thompson's at the time, Marsha Holt testified that she was in a bedroom, talking to her mother, Celeste Holt, when she saw

---

[2] Thompson testified that he did recognize defendant at the lineup—although defendant had new scratches on his face (apparently sustained during his arrest) and had shaved off his mustache—but explained that he had been unwilling to make an identification because he did not want to be a witness.

the officer follow the car to a stop. The woman who was driving (later identified as Pamela Cummings) got out of the car and, according to Marsha Holt, so did the tall, light-skinned, mixed-race front passenger (later identified as defendant). The officer, the driver, and the front passenger were talking, so Marsha Holt looked back at her mother, and told her what was happening. Suddenly, Marsha heard a gunshot. After a gap of two to 30 seconds, she heard more gunshots, one after another, and the officer fell straight back. The officer reached for his gun and pulled it out of his holster, but it dropped out of his hand and fell onto the street. Pamela jumped back in the car, made a U-turn at the corner, and came back. Meanwhile, defendant picked up the officer's weapon and hopped in the car on the passenger side. He pointed the gun at Marsha Holt and her cousin, Gail Beasley, as though to warn them not to say anything.

Marsha Holt said she saw defendant get out of the passenger side of the car and fire two shots, but she heard four or five shots in all. She also said that defendant got out of the car before any shots were fired. She did not identify anyone in a lineup as the shooter because defendant had shaved in the meantime and had acquired a scar, but she realized it was him "later on." She identified defendant's photograph before the grand jury and at the preliminary hearing and identified Pamela Cummings and defendant in person at the preliminary hearing and at both trials. She did not see the face of the man in the backseat, but she was acquainted with Raynard Cummings, since his mother and her mother were good friends.[3]

Gail Beasley testified she had been in the kitchen of the same house, which has a window looking onto the street, when the Cutlass was pulled over. Beasley testified that the shooting began when the driver got back in the car after talking with the officer. The front passenger (defendant), who was slim and had a light complexion and a mustache, came around the front of the car and was shooting at the officer. Beasley went inside the house and called 911. She told the police the shooter was a light-skinned Black male, six feet tall, 170 pounds, with a thin mustache and a short Jheri curl, and that he wore jeans or dark pants and a burgundy or burnt orange short-sleeved shirt. Beasley felt intimidated by being called a "snitch" by some people in the neighborhood and did not identify anyone at the police lineup four nights later, but did subsequently tell a detective that defendant was the shooter, although he had a scar on his face at the lineup that had not been there earlier. She identified defendant's photograph before the grand jury and identified defendant in person at the preliminary hearing and at both trials.

---

[3] Dr. Paul Michel, an expert concerning visibility conditions at crime scenes, testified that the line of sight and field of view from the bedroom were very limited and that obstacles would have further confounded Marsha Holt's view. He testified that the effect of these conditions was to increase the ambiguity perceived by the person making the observation.

Beasley's recollection differed in some ways from Marsha Holt's. Holt testified that she encountered Beasley after observing the shooting, on the way out of the house. Beasley, however, testified that she went to the bedroom where Holt and her mother were and informed them that an officer had been shot. Holt and her mother responded, "What? What's happening?," and gave the impression that they did not know what was going on.

Three members of the Martin family, who lived across the street from Robert Thompson, also testified for the prosecution.

Hans Martin, who was 15 years old at the time, observed that Officer Verna had made a traffic stop as he and his family returned from the supermarket. Hans was in the kitchen when he heard gunfire. His brother Oscar, then 12 years old, came in and announced that the officer had been shot. Hans ran to the front of the house and saw defendant get out of the car, now heading in the opposite direction, and remove the officer's gun from his holster. Defendant got back in the car, which drove off.

Sabrina Martin Medina, who was 14 at the time, also saw defendant retrieve a weapon, but she said the gun was a few feet away from the officer.

Rosa Martin, the children's mother, was also inside the house when she heard gunfire and went to investigate after Oscar announced that the officer had been shot. She too saw defendant pick up a gun from the street. Before defendant got back in the car, he pointed the weapon at their house as though to say, "I know who you are and I know where you live." Rosa used the officer's two-way radio to call for help. While waiting at the police station, she described the man who retrieved the gun as White. Oscar, however, said the man was Black, with a dark complexion like their neighbor's.

A police department field identification card dated June 2, 1983, recovered from the scene, bore Pamela Cummings's name. Officer Verna's gun holster was empty.

Meanwhile, defendant and the Cummingses drove to Raynard's aunt's house. Defendant took off his gray long-sleeved dress shirt; he had a white T-shirt on underneath. Pamela changed clothes, too. Each man had taken a gun out of the car. Defendant called Robin, his wife, to ask her to pick him up. Pamela and Raynard went to Raynard's mother's house.

When defendant called Robin, he said that something had happened and he seemed very excited. When she picked him up, he seemed very nervous. He started to tell her what happened, then stopped. Later on, Pamela and Raynard Cummings came by the apartment. Raynard was jumpy and nervous.

According to Pamela's testimony, Raynard and defendant each claimed credit for and reenacted the shooting. Raynard held out a gun and said, "I got him good. Pow, pow, pow." Defendant did the same thing with his hand. Robin, however, testified that only Raynard reenacted the shooting and took credit for it; defendant denied any involvement. Raynard explained that he would rather have killed a cop than have a cop kill him. Robin also testified that Raynard seemed concerned that she not call anyone and had Pamela follow her even when she stepped outside for a cigarette. Pamela denied keeping watch over Robin or being concerned that Robin would contact the police.

At some point, Robin drove Pamela to the Motel 6 where the Cummingses had been staying so that Pamela could pick up some of her clothes. On the way back to the apartment, Pamela asked Robin to pull the car over. Pamela called the police from a pay phone and, without identifying herself, said she had been in the car when the shooting of the officer occurred, along with defendant and one Milton Cook. Pamela did not know Milton Cook personally, but defendant knew him, and Pamela said they all had agreed to implicate him if they were ever arrested. Cook, who was tall and dark-complexioned, was similar in height and skin tone to Raynard Cummings.

Early the next morning, defendant and Raynard left in Robin's car. Later that day, Raynard called Pamela to say that they were in San Diego and instructed Pamela and Robin to meet them there. The women got on a bus in North Hollywood and headed south. Robin had a phone number they were to call once they arrived. The police, meanwhile, had commenced surveillance of Pamela and Robin that morning. Two Los Angeles Police Department detectives boarded the bus in plain clothes at a stop in downtown Los Angeles and sat four seats behind them. The detectives followed the women after they got off the bus in Oceanside, used a pay phone in the bus terminal, walked to a residential area, and then hid in some bushes for 15 to 20 minutes. When Pamela and Robin emerged from the bushes—they were worried about being followed—they got into Robin's car and proceeded in a southerly direction. Defendant and Raynard Cummings were crouched down in the backseat. The women stopped once at a convenience store to ask directions to Phoenix.

Robin's intent in going to Oceanside had been to get defendant away from Raynard and have him turn himself in to the police. Once she got in the car, however, she realized her plan was naive.

While Pamela was driving on the highway, she saw an occupant in the car behind them pass a walkie-talkie to another occupant. She was about to explain what she had seen when a helicopter lit up the sky and police cars converged on them and forced the car to a stop. Pamela and Robin were

ordered out of the car; to the surprise of the officers, defendant and Raynard were in the back of the car. Defendant was lying down on the rear floorboard; Raynard was stretched out on the backseat. Verna's service revolver was found on the floorboard, where defendant had been. Defendant also had a buck knife in his jacket; the knife had been taken from Richard Hallberg during the robbery in Reseda. The arresting officers noticed that defendant had an abrasion on his left cheek; he did not have it when Pamela and Robin got in the car.

Following her arrest for murder, Pamela made two statements to police placing defendant and Milton Cook at the scene. She claimed that Cook shot the officer. At the retrial, Pamela conceded that she falsely implicated Cook in order to protect Raynard, since Cook was similar in height and skin tone to her husband. Cook had no involvement in this crime, however. The district attorney eventually agreed to drop the murder charge against Pamela in exchange for her cooperation. She then pleaded guilty to the lesser offense of being an accessory to murder and to a couple of robberies and was not sentenced until after she testified at the first trial. Robin, too, was convicted of being an accessory to murder and was convicted also of one count of robbery.

The parties stipulated that Raynard Cummings fired the first shot, that two of Raynard's fingerprints were recovered from the inside grip of Officer Verna's service revolver, and that there was no latch or locking mechanism obstructing the free movement of the back of the driver's seat in the Cutlass that Pamela Cummings was driving on the day of the murder. Pamela Cummings testified also that the front seat had been moved forward so that she could reach the steering wheel.

*Autopsy Evidence*

The autopsy noted seven bullet entrance wounds, but one was a reentry wound. Only two of the bullets entered Officer Verna's body from the front; the remainder entered from the back. Two of the entry holes had gunpowder residue consistent with a shot fired at close range. At least one of the wounds indicated that Verna's body was on the ground when the gun was fired. All six bullets that struck Verna were fired from the same gun.

*Victim Impact Evidence*

Paul Verna's parents, John and Edith Verna, testified about his life. When Paul was growing up, the family lived on Gladstone Avenue, about three blocks from where he was killed. Paul was active in scouting and became an Eagle Scout. He also was a motorcycle enthusiast. After he graduated high

school, he joined the Air Force and then the Los Angeles Police Department. A few years later, he joined the fire department. But he missed being a police officer and, after a year, rejoined the police department. He was awarded the medal of valor in 1982, the police department's highest honor for heroism and bravery, for entering a burning building to rescue a couple of youngsters. He remained close to his parents and to his sister, Susan Blandford. In fact, he had been at his parents' home just hours before the murder to talk about a family fishing trip and to tell his mother about a Father's Day present he wanted to give John—a wrecked motorcycle he had rebuilt.

Paul Verna married Sandy Jackson in 1971. They had two children, Bryce and Ryan.

Bryce Verna, Paul's elder son, was only nine and a half years old when his father was killed. Bryce testified about the experience of discovering that his father had been killed and of growing up without his father. Bryce, like his father, joined the Air Force; afterwards, he, too, became a police officer. Bryce has seen many things in the department dedicated to his father.

Ryan Verna was only four years old when his father was killed. He was in the process of becoming a police officer and was scheduled to graduate shortly after the retrial. Ryan often was told that he looked like his father, which was difficult for him to hear because he had so few memories of his father.

Bryce Yokomizo met Paul Verna when they each were six or seven years old, and they became lifelong friends. Yokomizo's family spent many happy times with the Verna family, and Verna even named his son Bryce to honor Yokomizo.

*Other Evidence in Aggravation*

Rosie Lampignano Wright dated defendant for a few months when she was in high school. She broke up with him and knew he would be angry. One morning in May 1976, when he called her over to talk and she refused to go, he hit her two or three times in the face with his fist. She suffered a swollen lip and some cuts and bruises on her arms from the bushes he had thrown her into after hitting her.

Defendant was convicted of burglary in 1976.

In 1978, defendant dated and for a time lived with Jodi Lavalle, but got into an argument with her and her father when her father came to help her move out. Defendant threatened to kill Jodi and burn down her parents'

home. In the middle of the night on April 26, 1978, while Jodi was sleeping on the couch in the living room of her parents' home, defendant threw a Molotov cocktail through the living room window. It landed at the base of the couch and started a fire. Jodi suffered first degree burns "just about everywhere" and second and third degree burns on her feet and hands as well as scarring on her lips and chin and above her eye. Her father suffered blistering on his feet. Defendant was convicted of arson.

On September 13, 1982, defendant, then a convicted felon, was found in unlawful possession of a loaded firearm after police received a tip from an informant that defendant was planning to rob a bank.

On March 12, 1984, when Pamela Cummings walked past defendant's holding cell, he threatened her, saying, "You bitch. I don't care if I have to sniff gas. I am going to get you. I don't care how long it takes. You won't be able to hide. I am going to kill you."

On April 27, 1984, while defendant was in the hallway between cells at the county jail, he lit a torch he had devised out of a tightly rolled newspaper with toilet paper at the end and shoved it into another inmate's face.

In 1988, after defendant and Robin were divorced and defendant had remarried, defendant called Robin and told her he was going to send her a letter containing a "special message" that could be read when it was held up to a light. (Certain words had been typed over repeatedly.) The letter frightened Robin and she turned it over to her former parole officer. It read: "I plan to escape. Can you help? I really need an over and under two-shot Derringer. [¶] I tell you how. You can get me a package, canned goods. I hope to be happy with you and the children. [¶] I must use Jan [his new wife] as long as I am here. My heart isn't in it, but I will deal with it. [¶] Say bye-bye if you understand."

*Defense Evidence Concerning the Circumstances of the Crime*

At the penalty retrial, the defense was allowed to offer testimony concerning the circumstances of the murder only from eyewitnesses who had testified at the first trial.

Rose Marie Perez, who was a passenger in a car driving on Gladstone Avenue, looked down Hoyt Street and saw Officer Verna falling to the ground. The stopped car's passenger door was open, and defendant was coming around the car towards the officer. There did not appear to be anything in defendant's hands, although there might have been something Perez did not see.

Shequita Chamberlain, who was 15 or 16 at the time of the murder, was a passenger in another car on Gladstone Avenue. She heard a sound like a firecracker and saw Officer Verna start to fall. There was a tall, medium-dark-complexioned Black male alongside the stopped car, wearing a dark short-sleeved shirt. He may have had a mustache. She told the driver to turn around, and they went to Hoyt Street to assist the officer. Chamberlain did not identify anyone at a lineup at the police station a few days after the murder. The man she saw could not have been defendant, inasmuch as defendant's complexion was too light, but she did testify that the man she saw had a complexion similar to Raynard's.

The defense presented the prior trial testimony of Oscar Martin, who was 12 years old at the time of the murder and was living with his family on Hoyt Street. Oscar saw Officer Verna preparing to issue a ticket. As Oscar watched from the living room window, a man he later identified as Raynard Cummings got out of the backseat on the driver's side and shot the officer four times. Raynard got back in the car and drove off. Oscar ran to the kitchen to tell his mother and did not return to the window. Oscar did not recognize anyone at the lineup. He initially marked (and then erased) defendant's number in the lineup, but he was copying from his mother's card because he did not know what to do. At the police station, when his mother said that the man she saw was White, he tried to explain to her that he had seen the events from the beginning and that the *shooter* was Black, but she would not listen. No one else in the family saw the shots fired. The burn mark he saw on the shooter's face was like the one on Raynard's face and unlike the mark on defendant's face. Oscar did not see Raynard pass the gun to anyone else or see anyone else with a gun.

Marsha Holt's mother, Celeste Holt, whose prior grand jury testimony was read to the jury, was in the back of the house and did not hear the gunshots. But her niece, Gail Beasley, told her about the shooting, so she went to the front of the house and looked outside. Celeste saw a man with a gun and a police officer on the ground. The man with the gun had light skin, similar to defendant's skin tone, and had a Jheri curl and a white shirt. He got in the passenger side of the car, which drove off. She did not see the man's face. Mackey Como testified she was out back, moving furniture, when she heard that an officer had been shot. Because Como was a licensed vocational nurse, she went outside to attend to the officer. After the ambulance took the body away, Mary Cummings, an acquaintance and the mother of Raynard Cummings, walked into the yard and spoke with Como for a few minutes.

Former Los Angeles Police Officer Eric Lindquist testified that he interviewed Robert Thompson two or three hours after the shooting. Thompson said that the rear passenger, a medium-to-dark-complexioned Black male, six

feet two or six feet three, with a thin build and wearing baggy jeans and a brown short-sleeved shirt, exited the backseat of the car with a gun and was firing it as he approached Officer Verna. Thompson also saw this man bend over as though grabbing something from Verna's waistband. Thompson then left to call the police.[4]

Deborah Cantu, Pamela Cummings's sister, testified that she received a phone call from Pamela around 8:00 p.m. on the evening of the murder. Pamela was crying and scared and said she and defendant had offered a ride to a man named Milton Cook and were later stopped by the police. Pamela said she got out of the car to talk to the officer, but the officer went back to the car to see whether the passengers had any identification. Defendant said he did, but Cook pulled out a gun and shot the officer. Defendant was so scared he jumped out onto the ground; Pamela was so scared she ran back to retrieve her identification card. Milton kept firing, emptying the gun, and then grabbed the officer's weapon. Pamela said that Milton was a tall Black male with a medium complexion; she hoped no one would mistake him for Raynard, who (she said) had been at his mother's house the whole time. Cantu did not learn that her sister was lying until after Cook was released from custody.

Dr. Vincent Guinn, an expert in the detection of gunshot residue, estimated the firing distance for each entry wound. He testified that the distance between the gun and wound No. 6, which the parties stipulated was caused by the first shot, was between four and 11 feet. The distance for wound No. 3 was around two and one-half feet; for wound No. 1, a little over two feet; for wound No. 2, a little over a foot; and for wound No. 4 and wound No. 5, one foot.

Dr. William Sherry, senior deputy medical examiner for the County of Los Angeles and an expert in the field of medical examination and evaluation of autopsy reports, testified that all but one of the gunshot wounds were fatal. He also identified which wounds were to the front of the body and which to the back and also opined on the trajectory of the bullet causing each wound.

Dr. Martin Fackler, a consultant in wound ballistics, described the likely sequence of the bullet wounds. He testified that if wound No. 6 was first, it was followed by either wound No. 1 or No. 3, and then by Nos. 2, 4, and 5.

---

[4] Daniel Rose, a supervising investigator for the Los Angeles County Public Defender, interviewed Thompson a few months before the retrial. Thompson reiterated that after hearing the gunshot, he saw a dark-complexioned Black male exit the vehicle through the door on the driver's side, holding a smoking gun, and that the man continued firing shots at the officer. He never saw the front passenger, who appeared to be White, exit the vehicle. Thompson said he might be confused as to the names of the people involved, but not as to what they did.

Because Verna was likely standing when Nos. 1 and 3 occurred and because No. 2 severed Verna's spinal cord, Dr. Fackler opined that Verna was still standing at the time the bullet causing wound No. 2 was fired. The last two bullets, causing wounds No. 4 and No. 5, must have been fired when Verna was already on the ground.

### Other Defense Evidence

In 1995, Rosie Lampignano Wright told a defense investigator that the 1976 assault was the only time defendant ever laid a hand on her. Wright was shocked by the news that defendant was involved in Officer Verna's murder; it seemed totally out of character for him.

LaTwon Weaver, who met defendant when both were imprisoned on death row at San Quentin Prison, testified that defendant had been a friend and brother to him, that defendant had given up his limited phone time to allow Weaver to talk to his family, and that he and defendant were both Christians who believed in God. LaTwon's father, the Reverend Ray Weaver, had spent time with defendant in prison at prayer sessions and believed that defendant was sincere in his religious beliefs.

Mark Margulies, who knew defendant in elementary school, rekindled their friendship when he learned defendant was in prison. Based on their monthly visits when defendant was at San Quentin, Margulies found that defendant was like a brother and that defendant acted as an uncle to Margulies's kids. The two had a common bond in reading the Bible. Defendant told Margulies that the other man in the car shot Officer Verna.

Margulies, who is a cameraman for television and movies, discovered that defendant is a writer and that defendant had written a script, never produced, for the television show *Nash Bridges*. Defendant then wrote a screenplay called *A Children's Story*, which was submitted to the Writer's Workshop, an affiliate of the American Film Institute, and won an award. The actor Ed Asner, who had never met or spoken with defendant but who was the emcee at the awards ceremony, was highly impressed with the screenplay, which was a story about physically and mentally challenged children learning to trust, depend on, and survive with each other on a camping trip under adverse conditions.

Lou Margulies, Mark's wife, was initially skeptical about her husband's contacts with defendant, but testified that defendant had undergone an evolution in prison and that his was a life worth saving.

Gregory Hadley, an electrical engineer, met defendant through his friends the Margulieses, because he had been looking for someone to write a

screenplay based on an idea he had. In less than a month defendant prepared a screenplay that was 90 percent of what Hadley was looking for. Hadley met monthly with defendant over an 18-month period and found that defendant had a bright, active, and creative mind. Defendant expressed remorse for the robberies, but said he did not commit all of them.

Paul Harris, minister of the Church of the Nazarene in Novato (where defendant's current wife attends church), met defendant at San Quentin and found him to be thoughtful, intelligent, and creative, with a hunger for life. Harris believed defendant could have a positive impact on people.

*Rebuttal*

Dr. Stephen Horwitz, a psychiatrist who worked part time at the parole department, had interviewed defendant in 1983 about the arson at the Lavalle residence. Defendant admitted his culpability but appeared to have no remorse. Indeed, defendant said that the informant who had recently reported him for a parole violation was the same informant who had reported the arson. Defendant wanted to kill this man. According to Dr. Horwitz, defendant claimed "this was the proper action to take for someone who had done him wrong." Defendant also claimed he had committed a series of arsons beginning at age 18 or 19, generally for purposes of revenge. Defendant showed no remorse for these actions, either.

*Surrebuttal*

The Reverend Earl Smith, a chaplain at San Quentin, believed that defendant had sincerely embraced religion and said defendant was considered a leader in his lay prison ministry. Defendant has consistently denied shooting Officer Verna.

DISCUSSION

Defendant contends the trial court violated his right to present a defense under state and federal law, his right to introduce relevant mitigating evidence under state and federal law, his right to a fair and reliable penalty trial under state and federal law, and the state and federal prohibition on ex post facto laws, by preventing him from introducing testimony from eyewitnesses to the murder and other evidence designed to show that he did not shoot Officer Verna. Under the authority of *People v. Terry, supra,* 61 Cal.2d 137, 141–147, we conclude that the trial court's evidentiary rulings violated Penal Code section 190.3 and that the error, exacerbated by the trial court's admonition to the jury that defendant had been "conclusively proven" to be the shooter and to disregard any statement or evidence to the contrary, was prejudicial.

## A. *Proceedings on Retrial*

Prior to the penalty retrial, after the parties had stipulated that Raynard Cummings was unavailable as a witness, a dispute arose as to the admissibility of four of Raynard's out-of-court statements admitting that he had been the sole shooter: (1) on July 27, 1984, Raynard said to Deputy Sheriff Michael McMullen, "Hey man I'm no ghost. The only ghost I know is Verna. I put six in him. He took six of mine. Hope to see you all in the street, and I will put six in you like I did Verna"; (2) on October 2, 1984, he said to Deputy Sheriff William McGuiness, "Yeah, well, I put two in the front of the motherfucker, and he wouldn't have got three in the back if he hadn't turned and ran. Coward punk-ass motherfucker"; (3) in June 1983, he told fellow inmate Gilbert Gutierrez that "[a]s the officer started [to] back up, he said he then came out of the car through the driver's side and he fired two more times at the officer, striking him in the back. He said at that point he went up to the officer and the officer fell on his face and he turned over and he shot him again. He emptied out the gun, told him, 'there's your fucking I.D.' "; and (4) on unspecified occasions, he frequently bragged to fellow inmate Ricardo Phillips about shooting the officer "and laughed about what a dumb idea that the prosecution came up with regarding the passing of the gun." Although the People had themselves offered the first and third statements at the original trial (see *People v. Cummings, supra,* 4 Cal.4th at pp. 1264–1265), the People objected at the retrial that all four of Raynard's statements were irrelevant. The People relied on *In re Gay, supra,* 19 Cal.4th 771, where we observed that certain evidence impeaching a prosecution witness (Marsha Holt) who had testified at the guilt phase trial would not have been admissible for the first time at the penalty phase trial before the *same* jury. (*Id.* at pp. 813–814.) Defendant argued that, notwithstanding *In re Gay,* the rule concerning the admissibility of penalty phase evidence is "[a]bsolutely" different where, as here, there is a penalty retrial before a jury that did not hear the guilt phase evidence, citing *People v. Terry, supra,* 61 Cal.2d 137. Defendant further explained that Raynard's statements were offered to support a penalty phase defense of lingering doubt, not as evidence of reasonable doubt and not as an attempt to relitigate the prior jury's verdict.

The trial court, while expressing "no doubt" that Raynard Cummings's statements qualified as declarations against interest (Evid. Code, § 1230), nonetheless excluded the statements as irrelevant. The court agreed "that a defendant in a penalty phase retrial is entitled to present evidence to the jury that would establish some residual doubt, what you call lingering doubt. But that's an abstract concept. [¶] I think what you have to look at are the particular facts of a case. [¶] In this case, the only theory upon which the jury could have found defendant Gay guilty was on a theory that he, personally using a firearm, shot the officer. . . . [¶] There is just no way to reconcile the

proffered evidence that Gay is not the shooter with the jury's factual finding and guilt finding of Gay in the first trial. There is just no way to do it."

The trial court relied on the same rationale to exclude testimony from Kathy Pezdek, an expert on eyewitness identification. The defense had proffered her testimony to assist the jury in understanding the inconsistencies in the identifications made by Robert Thompson and other prosecution witnesses. The trial court further excluded the evidence under Evidence Code section 352 because it would involve an undue consumption of time and confuse the issues.

In opening statement, the district attorney identified "the circumstances of the murder" as one of the three primary factors in aggravation. Defense counsel agreed that the circumstances of the murder were important and stated his intent "to demonstrate exactly the way in which Officer Verna was murdered" and his belief that the evidence would show that defendant could not have shot and did not shoot Officer Verna. Immediately following the defense opening statement, the court declared that the defense had violated its prior ruling barring any challenge to the findings made by the jury at the earlier trial and announced its intent to instruct the jury to disregard any allegation that defendant was not the shooter and direct the jury instead to "conclusively assume and presume and accept the fact that your client did shoot and kill the officer." In open court, the trial judge told the jury that it was taking judicial notice of the verdict form in the prior trial—meaning that "it's conclusively proven" and is "a fact that cannot be disputed"—and read the verdict form. Over defense objection, the court then instructed the jury as follows: "Now, further, *any statement by the defense that you just heard in the opening statement to the effect that Kenneth Earl Gay did not personally shoot Officer Verna, you will disregard it. [¶] It's been conclusively proved by the jury in the first case that this defendant did, in fact, shoot and kill Officer Verna. [¶] So you will disregard any statements they made in opening statement, and you will not be hearing any evidence to the contrary during the trial.*" The defense moved for a mistrial, protesting that this instruction foreclosed the defense from arguing lingering doubt, but the motion was denied. The defense renewed its mistrial motion three more times, but it was denied on each occasion.

As the trial proceeded, the prosecution announced that, despite the trial court's ruling, it would not object to testimony that defendant was not the shooter, provided that such testimony came from witnesses who had testified at the guilt phase of the prior trial. Thus, the People did not object to testimony from Rose Marie Perez, Shequita Chamberlain, Oscar Martin, Celeste Holt, or former Police Officer Eric Lindquist. The People did, however, object to—and the trial court excluded—testimony from eyewitnesses Irma Esparza, Walter Roberts, and Inijio "Choppy" Rodriguez, as well

as additional testimony from Martina Ruelas, on the ground that the sole purpose for offering such testimony was to show that someone else was the shooter, which was not a relevant issue at the retrial.

The defense made offers of proof for each of the witnesses the trial court excluded.

Irma Esparza, who was 14 years old at the time of the murder, would have testified that she was in front of her house on Hoyt Street, watching her brother and his friends play football, when she heard a gunshot. She saw a tall Black male standing over the officer, who was on the ground. The complexion of the man she saw resembled Raynard Cummings's complexion and did not resemble defendant's; she did not consider defendant to be Black. During an interview with police the day after the shooting, Esparza said that a dark-skinned Black male shot the officer and that a light-skinned passenger retrieved the gun.

Esparza's brother, Inijio "Choppy" Rodriguez, who was playing football at the time of the murder, would have testified that he observed the traffic stop and then heard what he thought were fireworks coming from the area of the stopped car. He saw the officer on the ground and a medium-dark-complexioned Black male and a woman outside the vehicle.

Walter Roberts, who was 10 or 11 years old at the time and was also playing football, would have testified that he heard gunfire and saw a medium-dark-complexioned Black male exit the vehicle from the driver's side and fire two rounds into the officer, who was on the ground. A woman retrieved a gun from the officer's holster and went back into the car.

Martina Ruelas, who saw the traffic stop from the front yard of her home at Hoyt Street and Gladstone Avenue and who testified for the prosecution at the retrial, also would have described the shooter as a medium-complexioned Black male.

The defense also proposed to call Dr. Kenneth Solomon, an expert in crime and accident reconstruction and biomechanics, to testify concerning the speed and ease of exit out of the driver's side door for a person who was in the rear seat (like Raynard Cummings) and for a person who was in the front passenger seat (like defendant). Dr. Solomon was of the opinion that although defendant could not have performed the shooting as described by the eyewitnesses, Raynard could easily have exited the vehicle in the time that elapsed between the first and second shots. The trial court excluded this testimony as irrelevant and as not a proper subject for expert testimony.

Finally, the defense made an offer of proof of defendant's testimony. Defendant would have testified that Raynard Cummings fired all six shots

and that he himself did no more than open the passenger door and take a few steps to the rear of the car. Although the People had objected prior to the retrial that defendant could not testify inconsistently with the prior jury's verdict, the People ultimately withdrew their objection. The defense chose not to put defendant on the stand, however, because of the court's prior instruction to the jury that defendant's role as the shooter had been "conclusively proved," the court's admonition to the jury to disregard any statement that defendant was not the shooter, and the court's statement that the jurors would not be hearing any evidence that defendant was not the shooter. Although the trial court told counsel it would "revisit" the instructions already given if defendant were to testify, the court refused to announce, in advance, what changes might be made: "I'm not saying how I would reconsider them, but I would reconsider them." When defense counsel asked whether the court would also revisit its rulings excluding testimony from the eyewitnesses who could corroborate defendant's account, the court said, "I'm not saying I will; I'm not saying I won't." In light of the uncertainty as to whether the jury would be permitted to consider defendant's testimony and, if so, whether the jury would be able to hear from corroborating witnesses, defendant, following counsel's recommendation, declined to take the stand.

Following closing argument, the jury was instructed on lingering doubt as follows: "It is appropriate for a juror to consider in mitigation any lingering doubt he or she may have concerning defendant's guilt. Lingering or residual doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt."

> B. *Evidence That Defendant Was Not the Shooter Was Admissible at the Penalty Retrial Under Penal Code Section 190.3 as a Circumstance of the Offense*

Defendant contends that the evidence suggesting he was not the shooter was relevant and admissible at his penalty retrial as a "matter relevant to . . . mitigation, and sentence," such as "the nature and circumstances of the present offense." (Pen. Code, § 190.3.) He contends further that the jury, in determining the appropriate penalty, could properly have considered the excluded evidence under section 190.3, factor (a), which provides for consideration of "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding"; section 190.3, factor (j), which provides for consideration of "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor"; and section 190.3, factor (k), which provides for consideration of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

The trial court was under the impression that a defendant at a penalty retrial could not present evidence that was inconsistent with the verdict reached in the guilt phase. In light of the jury's finding that defendant here personally used a firearm in the commission of the murder, the court reasoned that the jury necessarily found that defendant was the shooter. Accordingly, the court concluded that any evidence to the contrary was irrelevant and inadmissible at this penalty retrial. This was error.

The controlling authority is *People v. Terry, supra,* 61 Cal.2d 137, which (like the present case) involved an appeal from a penalty retrial. Terry had been convicted in the prior trial of first degree murder on a theory that the killing occurred "in the commission of a robbery or to prevent an arrest for such an offense, with intent to so evade arrest." (*People v. Terry* (1962) 57 Cal.2d 538, 564 [21 Cal.Rptr. 185, 370 P.2d 985].) At the penalty retrial, Terry sought, unsuccessfully, to offer evidence that he had not been at the scene of the robberies and was innocent of them. He was also barred from offering evidence that the discharge of the gun that resulted in the death of the officer was an accident. Terry would have testified that the shooting occurred when the officer demanded to know what was wrapped up in a sweater in his hands and lunged at Terry, "precipitating as a reflex action defendant's discharge of the gun." (*People v. Terry, supra,* 61 Cal.2d at p. 140.)

In reversing the judgment and ordering a third penalty trial, we declared that the text of Penal Code former section 190.1, which sanctioned "the presentation of evidence as to 'the circumstances surrounding the crime . . . and of any facts in . . . mitigation of the penalty,' " encompassed evidence relating to a "defendant's version of such circumstances surrounding the crime or of his contentions as to the principal events of the instant case in mitigation of the penalty." (*People v. Terry, supra,* 61 Cal.2d at p. 146 (*Terry*).) Our decision, which was the first in which we recognized the theory of lingering doubt as a mitigating factor (see *People v. Johnson* (1992) 3 Cal.4th 1183, 1259 [14 Cal.Rptr.2d 702, 842 P.2d 1] (conc. opn. of Mosk, J.)), further explained: "Indeed, the nature of the jury's function in fixing punishment underscores the importance of permitting to the defendant the opportunity of presenting his claim of innocence. The jury's task, like the historian's, must be to discover and evaluate events that have faded into the past, and no human mind can perform that function with certainty. Judges and juries must time and again reach decisions that are not free from doubt; only the most fatuous would claim the adjudication of guilt to be infallible. The lingering doubts of jurors in the guilt phase may well cast their shadows into the penalty phase and in some measure affect the nature of the punishment." (*Terry, supra,* 61 Cal.2d at p. 146.) "If the same jury determines both guilt and penalty, the introduction of evidence as to defendant's asserted innocence is unnecessary on the penalty phase because the jury will have heard that

evidence in the guilt phase. If, however, such evidence is excluded from the penalty phase, the second jury necessarily will deliberate in some ignorance of the total issue. [¶] . . . [¶] The purpose of the penalty trial is to bring within its ambit factors such as these." (*Ibid.*)

The People attempt to distinguish *Terry*, but their efforts are unconvincing. The People claim first that "[u]nder the current death penalty law, a trial court has discretion to exclude irrelevant evidence at the penalty phase." But the same was true under former versions of Penal Code section 190.1. (See, e.g., *People v. Hill* (1967) 66 Cal.2d 536, 569 [58 Cal.Rptr. 340, 426 P.2d 908].) In fact, *Terry* noted three restrictions on the subject matter of a penalty trial under the statute then in effect: the evidence "must not be incompetent" (*Terry, supra,* 61 Cal.2d at p. 144, fn. omitted), the evidence "must not be irrelevant" (*ibid.*) or lack " 'probative value' " (*id.* at p. 145, fn. 5), and the evidence "must not be directed solely to an attack upon the legality of the prior adjudication" (*id.* at p. 145).

■ The People point out, correctly, that the prior death penalty law, including Penal Code former section 190.1, was declared unconstitutional in 1972 (*People v. Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]) and was eventually replaced by the current statutory scheme, which provides constitutionally adequate guidance for the sentencer's discretion (*People v. Cox* (1991) 53 Cal.3d 618, 678 [280 Cal.Rptr. 692, 809 P.2d 351]). But even though Penal Code former section 190.1 was repealed, Penal Code section 190.3 repeats the substance of the former section insofar as the admissibility of this type of mitigating evidence is concerned. As stated above, *Terry* relied on the portion of Penal Code former section 190.1 that authorized the admission of evidence as to " 'the circumstances surrounding the crime . . . and of any facts in . . . mitigation of the penalty.' " (*Terry, supra,* 61 Cal.2d at p. 146.) Current Penal Code section 190.3 similarly authorizes the admission of evidence "as to any matter relevant to . . . mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense" (Pen. Code, § 190.3), and a defendant may rely on such evidence to "urge his possible innocence to the jury as a factor in mitigation" (*People v. Johnson, supra,* 3 Cal.4th at p. 1252; see also *People v. Blair* (2005) 36 Cal.4th 686, 749 [31 Cal.Rptr.3d 485, 115 P.3d 1145] ["The 'circumstances of the crime' as used in section 190.3, factor (a), 'does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to "[t]hat which surrounds materially, morally, or logically" the crime.' "]). Indeed, we have observed that the "rationale" of *Terry,* which "Justice Tobriner eloquently expressed" (and which is quoted, *ante,* at pp. 1218–1219), "obtains to this day." (*People v. Cox, supra,* 53 Cal.3d at p. 677; see also *People v. Hawkins* (1995) 10 Cal.4th 920, 966–967 [42 Cal.Rptr.2d 636, 897 P.2d 574] ["residual doubt about a defendant's guilt is something that juries may consider at the penalty phase under California law,

and a trial court errs if it excludes evidence material to this issue" (citing *Terry*)]; *People v. Johnson, supra,* 3 Cal.4th at p. 1259 (conc. opn. of Mosk, J.) ["In the almost 30 years that have passed since we decided *Terry*, we have firmly adhered to its teaching."].)

The People contend next that to the extent *Terry* concluded that evidence of innocence was one of the "circumstances" of the offense, it has been repudiated by subsequent United States Supreme Court decisions. It is true, as we have previously observed, that "[a] capital defendant has no federal constitutional right to have the jury consider lingering doubt in choosing the appropriate penalty." (*People v. Stitely* (2005) 35 Cal.4th 514, 566 [26 Cal.Rptr.3d 1, 108 P.3d 182]; see also *Oregon v. Guzek* (2006) 546 U.S. 517, 525–526 [163 L.Ed.2d 1112, 126 S.Ct. 1226].) But *Terry* did not purport to base its holding or analysis on *any* constitutional right, state or federal; rather, it was our death penalty *statute* that authorized the admission of evidence of innocence at a penalty retrial—and, although the statute has since been revised, the rule "obtains to this day." (*People v. Cox, supra,* 53 Cal.3d at p. 677.)

The various state cases cited by the People likewise do not undermine *Terry*. In *People v. Zapien* (1993) 4 Cal.4th 929 [17 Cal.Rptr.2d 122, 846 P.2d 704], the defendant attempted to introduce evidence of a plea bargain offered by the prosecution but rejected by the defendant and evidence of prosecutorial misconduct in interviewing a potential witness who was not called to testify. (*Id.* at p. 989.) We upheld the trial court's determination that the proffered evidence was not relevant to any issue, emphasizing that a defendant has no right to "introduce evidence, *not otherwise admissible at the penalty phase,* for the purpose of creating a doubt as to the defendant's guilt." (*Ibid.,* italics added; see also *People v. Blair, supra,* 36 Cal.4th at p. 750.) In *People v. Miller* (1990) 50 Cal.3d 954 [269 Cal.Rptr. 492, 790 P.2d 1289], we upheld the exclusion of statements made by the attempted murder victim under hypnosis several months after the crime. (*Id.* at p. 1005.) The trial court had already determined that the statements were unreliable and hence inadmissible at the guilt phase—a ruling that Miller did not challenge—and made the same ruling at the penalty phase. (*Ibid.*) We distinguished *Terry* on the ground that the penalty phase jury there "had not been present at the guilt phase of the trial" and was "not allowed to consider evidence which had been *admissible* at the guilt phase." (*Id.* at p. 1006, fn. 21; see also *People v. Nye* (1969) 71 Cal.2d 356, 370 [78 Cal.Rptr. 467, 455 P.2d 395].) And in *People v. Champion* (1995) 9 Cal.4th 879 [39 Cal.Rptr.2d 547, 891 P.2d 93], we upheld the exclusion of *hearsay* evidence that Champion was not guilty of the murders. (*Id.* at p. 938.) Each of these cases illustrates the well-settled principle, recognized in *Terry* itself, that evidence that is incompetent or irrelevant is not admissible at the penalty phase. (*Terry, supra,* 61 Cal.2d at pp. 144–145; see also *People v. Blair, supra,* 36 Cal.4th at p. 750 ["evidence

proffered on the issue of lingering doubt may be excluded because the evidence in question is otherwise inadmissible as hearsay or is unreliable"].) None calls into question what " 'is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty.' " (*Terry, supra,* 61 Cal.2d at p. 143, fn. 1; see also *People v. Blair, supra,* 36 Cal.4th at p. 749.)

Finally, the People claim that we impliedly overruled *Terry* in *In re Gay, supra,* 19 Cal.4th 771. *In re Gay* addressed a challenge to the competency of counsel at the original penalty phase trial. In the course of our analysis, we addressed and rejected defendant's claim that counsel had been deficient in failing to offer testimony from Don Anderson, who " 'might have testified in the penalty phase portion of Petitioner's trial that witness Marsha Holt stated to him that she had not, in fact, seen the murder as she had earlier testified to in the guilt portion of the trial.' " (*Id.* at p. 813.) We found that Anderson's testimony would not have been admissible at the penalty phase and, in particular, that "the defendant may not retry the guilt phase of the trial in an effort to create such a [lingering] doubt." (*Id.* at p. 814.) *In re Gay,* then, involved the admissibility of evidence at a penalty phase trial before the same jury that determined guilt. It did not consider the scope of admissible evidence when, as here and in *Terry,* there is a *retrial* of the penalty. (Cf. *People v. Miller, supra,* 50 Cal.3d at p. 1006, fn. 21.)[5]

■ Our holding that evidence of the circumstances of the offense, including evidence creating a lingering doubt as to the defendant's guilt of the offense, is admissible at a penalty retrial under Penal Code section 190.3 is in accord with other jurisdictions that, like California, have recognized the legitimacy of a lingering doubt defense at the penalty phase of a capital trial.

In *Blankenship v. State* (1983) 251 Ga. 621 [308 S.E.2d 369], for example, the Georgia Supreme Court reversed a judgment of death and remanded for a third penalty trial because the trial court had excluded evidence that a third party may have accompanied the defendant to the victim's apartment and that the third party was responsible for the rape and beating that resulted in the victim's death. The trial court, like the trial court here, "reasoned that since the defendant had been convicted of rape and murder by a previous jury, the circumstances of the offense and whether someone else had been involved were matters irrelevant to this jury's decision." (*Id.,* 308 S.E.2d at p. 371.)

---

[5] Our broad statement in *In re Gay* that "[e]vidence intended to create a reasonable doubt as to the defendant's guilt is not relevant to the circumstances of the offense or the defendant's character and record" (*In re Gay, supra,* 19 Cal.4th at p. 814), which was not supported by citation to any authority, seems to be in tension with our other decisions concerning lingering doubt. Because defendant does not challenge the correctness of this dicta as applied to a penalty phase trial before the same jury that determined guilt—and because this case does not present such a scenario—we have no cause to resolve the tension here.

The Georgia Supreme Court disagreed: "When the sentencing phase of a death penalty case is retried by a jury other than the one which determined guilt, evidence presented by the defense, as well as evidence presented by the state, may not be excluded on the ground that it would only 'go to the guilt or innocence of the defendant.' In essence, although the resentencing trial will have no effect on any previous convictions, the parties are entitled to offer evidence relating to circumstances of the crime." (*Ibid.*; see also *Alderman v. State* (1985) 254 Ga. 206 [327 S.E.2d 168, 173] ["When a case is retried as to sentence, both the state and the defendant are entitled to offer evidence on the issue of guilt or innocence, not because the validity of the conviction is at issue, but because the jury needs to examine the circumstances of the offense (as well as any aspect of the defendant's character or prior record) in order to decide intelligently the question of punishment."].) Indeed, "[i]t may have particular importance where, as here, the case is being retried as to sentence and the jury is hearing for the first time, at the sentencing phase of the trial, evidence relating to the circumstances of the offense." (*Romine v. State* (1986) 256 Ga. 521 [350 S.E.2d 446, 453].)

In *State v. Stewart* (1986) 288 S.C. 232 [341 S.E.2d 789], the South Carolina Supreme Court reversed a death judgment and remanded for a third penalty trial because the trial court had excluded evidence of the defendant's alibi as inconsistent with the jury's verdict of guilt. The South Carolina Supreme Court declared that "[i]n a resentencing hearing, each side has the right to put into evidence anything that is properly put into evidence during the guilt or sentencing phase of the previous trial." (*Id.*, 288 S.C. at p. 235 [341 S.E.2d at p. 790].) "The bifurcated structure of a capital proceeding should not be used to prevent guilt phase evidence from being considered in the penalty phase. Since the state's evidence of guilt is admissible at the resentencing hearing, basic fairness requires that the appellant's evidence of innocence be admitted as well." (*Id.* at pp. 235–236 [341 S.E.2d at p. 791]; cf. *People v. Blair, supra*, 36 Cal.4th at pp. 749–751.)

Similarly, in *State v. Teague* (Tenn. 1995) 897 S.W.2d 248 (*Teague*), the Tennessee Supreme Court accepted an interlocutory appeal during a third penalty trial concerning an evidentiary ruling that would have barred the defendant from introducing evidence of his innocence of the murder of which he had been convicted. (*Id.* at pp. 249–250.) The court reviewed our decision in *Terry* as well as decisions from the Supreme Courts of Georgia and South Carolina and held that a defendant had the right at a penalty retrial to present "evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability. Evidence otherwise admissible under the pleadings and applicable rules of evidence is not rendered inadmissible because it may show that the defendant did not kill the victim, so long as it is probative on the issue of the

defendant's punishment." (*Teague, supra,* 897 S.W.2d at p. 256; see also *State v. Hartman* (Tenn. 2001) 42 S.W.3d 44, 57–58.)

*Teague,* like *Terry,* cautioned that a defendant may not "relitigate" the guilt verdict. (Compare *Teague, supra,* 897 S.W.2d at p. 252, with *Terry, supra,* 61 Cal.2d at p. 145.) But, as both opinions make plain, this means simply that a defendant may not contest "the legality of the prior adjudication" (*Terry, supra,* at p. 145), such that "evidence related only to the legal issue of guilt or innocence . . . and . . . not . . . to the circumstances of the crime or aggravating or mitigating circumstances . . . was not admissible" (*Teague, supra,* 897 S.W.2d at p. 252; accord, *People v. Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776]). "[T]hat the defendant cannot relitigate the issue of guilt or innocence . . . does not preclude the admission of evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate a defendant's culpability by showing that he actually did not kill the victim. The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances." (*Teague, supra,* 897 S.W.2d at p. 252.) Because Raynard Cummings's admissions that he was the only shooter and the corroborating testimony of the eyewitnesses proffered by defendant related to the circumstances of the crime, we find that the trial court abused its discretion in excluding this evidence as irrelevant at the penalty retrial.

### C. *The Exclusion of the Evidence Was Prejudicial*

Error in admitting or excluding evidence at the penalty phase of a capital trial is reversible if there is a reasonable possibility it affected the verdict. (*People v. Lancaster* (2007) 41 Cal.4th 50, 94 [58 Cal.Rptr.3d 608, 158 P.3d 157]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1144–1145 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Under the particular circumstances of this case, we find that the error was prejudicial.

There can be no dispute that the identity of the shooter was the heart of defendant's penalty phase defense. Although the trial court's evidentiary rulings did not entirely preclude defendant from advancing this defense, those rulings surely crippled it. The defense was allowed to present only four eyewitnesses, two of whom—Rose Marie Perez and Shequita Chamberlain—were not even on Hoyt Street when the shooting began. They were passengers in cars on Gladstone Avenue.[6] A third witness, Celeste Holt, said she

---

[6] Chamberlain, furthermore, had been diagnosed with an anxiety disorder that affected her short-term and long-term memory.

saw a man with a gun who resembled defendant get into the car after the shooting had stopped. Because her grand jury testimony was simply read to the jury, neither side was able to examine her about her observations. But her testimony did little to advance the defense theory, as the defense never disputed that defendant had gotten out of the car to retrieve a weapon after the shooting.

In short, the trial court's rulings effectively limited the defense to a single eyewitness who had been present on Hoyt Street from the beginning of the incident, Oscar Martin (whose prior trial testimony was read to the jury), and excluded the defense from presenting testimony from the four other eyewitnesses—Irma Esparza, Inijio "Choppy" Rodriguez, Walter Roberts, and Martina Ruelas—who were also present and who would have described the shooter's complexion as inconsistent with defendant's but consistent with Raynard Cummings's. Esparza, in particular, would have testified that the man with Raynard's complexion shot the officer and that a lighter skinned male subsequently retrieved the gun, which could have explained why Rosa, Sabrina, and Hans Martin (who looked outside only after the shooting had ended) identified defendant as the man they saw and why Oscar Martin (who was the only Martin to see the shooting) identified Raynard Cummings as the shooter. These additional witnesses would have substantially bolstered the defense theory of lingering doubt.

Moreover, although the defense was permitted to offer isolated pieces of a circumstantial theory that Pamela Cummings was lying to cover up her husband's involvement and was attempting to shift the blame to defendant instead—i.e., that she told her sister, Deborah Cantu, as well as the police, that Milton Cook, who resembled Raynard, was the shooter, and that Robin Anderson denied seeing defendant reenact the shooting or claim responsibility for it, as Pamela had claimed—the defense was precluded from presenting the far more powerful evidence that Raynard himself, on at least four occasions, had admitted firing all of the shots.

We need not decide whether the evidentiary rulings alone were prejudicial here, though, because the error was compounded by the trial court's instruction to the jury, following opening statement, that defendant's responsibility for the shooting had been conclusively proven and that there would be no evidence presented in this case to the contrary. In opening statement, the defense position was that defendant had not been the shooter, that the jury was entitled to consider what role (if any) defendant had in the murder, but that the defense was not attacking the conviction. The opening statement made reference to several witnesses who subsequently were not permitted to testify about the murder, including Martina Ruelas, Inijio "Choppy" Rodriguez, Walter Roberts, and Dr. Kenneth Solomon, and concluded with

the contention that "we believe the evidence in this case will clearly show that Kenny Gay could not have and did not shoot Officer Verna." Following a recess and before the jury reconvened, the prosecution objected to the defense opening statement to the extent it was inconsistent with the verdict of guilt and urged the court to admonish the jury that they should disregard the opening statement and that they would not be hearing evidence that defendant was not the shooter. Over a defense objection, the court declared that it was "going to tell the jury to disregard any statement by you that Mr. Gay is not the shooter. They are to conclusively assume and presume and accept the fact that your client did shoot and kill the officer."

When the proceedings resumed, the court instructed the jury accordingly. The court began by taking judicial notice of (and reading) the *verdict* and explained that "when I take judicial notice of something, it means it's conclusively proven. It's a fact that cannot be disputed." This, of course, was no more than a reiteration of its preinstruction to the jury.[7] Over defense objection, however, the court additionally directed the jury as follows: "Now, further, any statement by the defense attorneys that you just heard in the opening statement to the effect that Kenneth Earl Gay did not personally shoot Officer Verna, you will disregard it. [¶] It's been conclusively proved by the jury in the first case that this defendant did, in fact, shoot and kill Officer Verna. [¶] So you will disregard any statements they made in the opening statement, and you will not be hearing any evidence to the contrary during the trial."

■ Although the trial court instructed the jury at the close of evidence that "[i]t is appropriate for a juror to consider in mitigation any lingering doubt he or she may have concerning defendant's guilt" and then defined lingering doubt, the court refused to withdraw its earlier, inconsistent instruction on the issue. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." (*Francis v. Franklin* (1985) 471 U.S. 307, 322 [85 L.Ed.2d 344, 105 S.Ct. 1965].) Nor does anything in the record suggest that the jury understood how to weigh the evidence that was admitted. The People in closing argument repeatedly relied on the earlier erroneous instruction, which was printed on a poster displayed to the jury and made part of the People's plea for the penalty of death. The prosecutor even quoted the offending portion in his summation.

---

[7] "In 1985 in this courthouse, another jury found the defendant, Kenneth Earl Gay, guilty of the crime of murder of the first degree. This same jury also found that the defendant, in committing the crime of murder of the first degree, personally used a firearm in the commission of the murder, and also that a principal in that murder was armed with a firearm, and the jury also found to be true the two special circumstances that were referred to during your jury selection process. [¶] You must accept the findings of the jury as to guilt and these other findings."

The jury exhibited its confusion over the instructions by interrupting deliberations to request an explanation of the instruction on lingering doubt, underlining in particular the phrase "consider in mitigation any lingering doubt." The trial court's response, once again, was inadequate: "There's really no other way to explain that. It should be fairly clear on its face. *But you may want to look at all of the instructions given so far*. And there is a definition of reasonable doubt that's contained elsewhere in the instructions." Because the court's response did no more than refer the jury to *each* of the contradictory instructions—the one that "should be fairly clear on its face" and the one that was part of "all of the instructions given so far"—we, as a reviewing court, have "no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." (*Francis v. Franklin, supra*, 471 U.S at p. 322, fn. omitted; see generally *Bollenbach v. United States* (1946) 326 U.S. 607, 612–613 [90 L.Ed. 350, 66 S.Ct. 402] ["When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."].) Indeed, the court had previously told the jury that all the instructions, whenever given, were of equal importance. It is discomforting, though, that, following this inadequate reinstruction, the jury reached a verdict the very next morning.

The combination of the evidentiary and instructional errors presents an intolerable risk that the jury did not consider all or a substantial portion of the penalty phase defense, which was lingering doubt. The defense could have had particular potency in this case, given the absence of physical evidence linking defendant to the shooting and the inconsistent physical and clothing descriptions given by the prosecution eyewitnesses. (See *People v. Cummings, supra*, 4 Cal.4th at p. 1259 ["Their versions of the events and identification of the shooter or shooters varied greatly."].) Robert Thompson, for example, told police in the first few hours after the murder that the passenger in the rear seat had fired all the shots and that this man had a medium-to-dark complexion and was wearing a brown short-sleeved shirt and baggy jeans.[8] Thompson gave the same account to the grand jury and to defense counsel a few months before the penalty retrial. Gail Beasley's description shortly after the murder of the shirt worn by the shooter—that it was burnt orange or red—was likewise consistent with Raynard Cummings's clothing and inconsistent with defendant's. Marsha Holt, who said she was in the bedroom talking to her mother when the shooting began, described the shooter as wearing a long-sleeved white shirt, but her account of the events was impeached by her mother's denial of being in the bedroom at the time as well as by her mother's testimony that she had been unaware of the shooting until Gail Beasley told her about it, by the testimony of the defense expert that Marsha's line of sight and field of view were limited, by Beasley's testimony

---

[8] Raynard Cummings was wearing a burgundy short-sleeved pullover shirt. Defendant was wearing a long-sleeved, light gray dress shirt.

that neither Marsha nor Celeste appeared to know that an officer had been shot, and by Marsha's inability to identify defendant in a lineup a few days after the murder. The remaining eyewitness to the shooting, Pamela Cummings, had an obvious interest in protecting her ex-husband.[9]

■ The People are certainly correct that the other aggravating evidence in this case was significant. The series of robberies defendant and Raynard Cummings committed and the arson defendant committed on his own were unusually—and unnecessarily—brutal and cruel, and there was scant evidence in defendant's social history to excuse or mitigate these heinous crimes. The prosecution also vividly presented the effect of this crime on Officer Verna's family and friends. But it is our firm belief that, notwithstanding this aggravating evidence, there is a reasonable possibility the jury would have selected the lesser but still serious penalty of life imprisonment without the possibility of parole had it been allowed to hear and consider the compelling defense of lingering doubt in full. (Cf. *In re Gay, supra,* 19 Cal.4th at p. 830.) As other courts have noted, "residual doubt is perhaps the most effective strategy to employ at sentencing." (*Chandler v. U.S.* (11th Cir. 2000) 218 F.3d 1305, 1320, fn. 28; accord, *Williams v. Woodford* (9th Cir. 2002) 384 F.3d 567, 624; see also Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* (1998) 98 Colum. L.Rev. 1538, 1563.) The jury's request for clarification of the instructions on the issue of residual doubt, combined with the jury's previous request for the court to read back the eyewitness and expert testimony relating to the circumstances of the murder, strongly indicate that the jury was focused on defendant's role in the murder. Evidence indicating that defendant was not the actual shooter would have been important to the jury in assessing the appropriate penalty. (See *In re Hardy* (2007) 41 Cal.4th 977, 1032–1035 [63 Cal.Rptr.3d 845, 163 P.3d 853].) Had the jury been allowed to hear—and consider—the four statements in which Raynard Cummings claimed to be the sole shooter, the testimony of the four defense eyewitnesses excluding defendant as the shooter, and the testimony that defendant nonetheless was the man who came out of the car to retrieve a weapon from the ground (thus offering an explanation why the prosecution eyewitnesses had been able to recognize him), there is a reasonable possibility the jury would have selected a different penalty. (See *Terry, supra,* 61 Cal.2d at p. 147; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089–1090 [56 Cal.Rptr.2d 142, 921 P.2d 1] [finding prejudice where the prosecutor's argument and the jury's request for clarification indicated the subject of the misinstruction was critical to their deliberations]; *People v. Roder* (1983) 33 Cal.3d 491, 505 [189 Cal.Rptr. 501, 658 P.2d 1302] [same]; cf. *People v. DeSantis* (1992) 2 Cal.4th 1198, 1238–1240 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [no error where the rulings and comments by the court and by the prosecutor "merely reminded the jury that it was not to redetermine

---

[9] The Cummingses were no longer married at the time of the retrial.

*guilt,*" the rulings and comments "did not remove the question of lingering doubt from the jury," and the defendant "was able virtually to retry the guilt phase case under the guise of introducing evidence of the circumstances of the crime to the penalty jury"].)[10]

### D. *Other Penalty Phase Issues*

Defendant raises numerous other claims of error relating to the penalty phase and to the validity of his death sentence. We need not reach these claims, however, given our finding of the prejudicial evidentiary and instructional error above. (*People v. Cash* (2002) 28 Cal.4th 703, 741 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

### DISPOSITION

The judgment of death is reversed.

Kennard, Acting C. J., Werdegar, J., Chin, J., Moreno, J., Corrigan, J., and Marchiano, J.,[*] concurred.

**WERDEGAR, J.,** Concurring.—I concur fully in the majority opinion, which I have signed. I write separately to emphasize that the rationale of our decision is logically inconsistent with remarks this court made in *In re Gay* (1998) 19 Cal.4th 771 [80 Cal.Rptr.2d 765, 968 P.2d 476] on the irrelevance of lingering doubt evidence. Today's decision thus effectively overrules *In re Gay* on this point.

The evidence defendant offered at the penalty retrial in this case to raise doubts as to whether he personally shot the victim was excluded partly on the basis of this court's statements in *In re Gay* that lingering doubt evidence is "not relevant to the circumstances of the offense" and constitutes a prohibited attempt to "retry the guilt phase of the trial." (*In re Gay, supra,* 19 Cal.4th at p. 814.) As the majority explains, however, lingering doubt evidence is in fact relevant to "the nature and circumstances of the present offense" within the

---

[10] The trial court also excluded (1) testimony from Dr. Pezdek, the defense expert on eyewitness identification, as irrelevant and an undue consumption of time; (2) a computer-animated recreation of the shooting, proffered by defendant, as irrelevant; and (3) testimony from Dr. Solomon, the defense expert on crime and accident reconstruction, as irrelevant and (at least in part) as not the proper subject for expert testimony. Because these rulings rested in substantial part on the trial court's mistaken understanding of what type of evidence was relevant at the penalty retrial, we leave it to the trial court to reconsider these rulings under the correct standard of relevance at retrial, should the defense attempt again to offer this evidence.

[*]Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

meaning of Penal Code section 190.3 and "the circumstances of the crime" within the meaning of that section's factor (a). (Maj. opn., *ante*, at pp. 1219–1220, 1221.) If evidence going to the degree or nature of the defendant's criminal participation is not otherwise barred—if it would have been admissible in the guilt trial—it is also admissible in the penalty trial. (*Id.* at pp. 1220–1221.)[1]

The majority acknowledges the "tension" between *In re Gay*'s statement of irrelevance and our repeated holdings of relevance, but finds it unnecessary to resolve that tension because *In re Gay* concerned the penalty phase of a *unitary* trial, while this case involves admission of lingering doubt evidence in a penalty *retrial*. (Maj. opn., *ante*, at p. 1221, fn. 5.) The distinction is, of course, factually valid, but it should not mislead future courts into believing that *In re Gay*'s statement retains any logical force or authority.

Whether in the penalty phase of a unitary trial or in a penalty retrial, Penal Code section 190.3 provides the applicable substantive law. We hold today, as we have in past decisions, that lingering doubt evidence is relevant under that statute. (Maj. opn., *ante*, at p. 1221.) Our holding today, although made in the context of a penalty retrial, logically applies as well to an ordinary penalty phase. What is relevant in one is equally relevant in the other. No logical room remains for *In re Gay*'s contrary statement.

Of course, in an ordinary penalty phase, tried before the same jury that recently heard and decided guilt, the defense is far less likely to offer lingering doubt evidence, and the court might legitimately exclude some offered evidence as cumulative and wasteful of court time. (Evid. Code, § 352.) The same is not true in a penalty retrial. We referred to this difference in *People v. Terry* when we observed that introduction of lingering doubt evidence at a penalty phase would be "*unnecessary* . . . because the jury will have heard that evidence in the guilt phase," while a retrial jury, without the evidence, would "deliberate in some ignorance of the total issue." (*People v. Terry* (1964) 61 Cal.2d 137, 146 [37 Cal.Rptr. 605, 390 P.2d 381], italics added.) But this difference in the two procedural circumstances does not affect the *relevance* of lingering doubt evidence; under Penal Code section 190.3, such evidence is as relevant in an ordinary penalty phase as in a penalty retrial.

---

[1] The *In re Gay* court's second rationale, that lingering doubt evidence represents an improper attempt to "retry" the guilt phase, is easily rebutted. Because of differing standards of proof at the two trial phases, no inconsistency arises when a jury considers lingering doubt evidence at the penalty phase. That the same or a different jury found the defendant guilty *beyond a reasonable doubt* at the guilt trial does not logically preclude the penalty jury from entertaining *residual doubt* as to the nature or extent of the defendant's guilt. The trial court below was simply incorrect in holding "[t]here is just no way to reconcile" defendant's proffered lingering doubt evidence with the previous guilt jury's finding (made on a beyond-a-reasonable-doubt standard) that he personally used a firearm in the murder.

The majority explicitly distinguishes, rather than overrules, the court's statement in *In re Gay*, *supra*, 19 Cal.4th at page 814, regarding the irrelevance of lingering doubt evidence. But the rationale of our decision leaves no doubt that the statement is incorrect. Future courts should not follow it.

Kennard, Acting C. J., and Marchiano, J.,* concurred.

---

*Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.