Filed 10/17/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL R. LEWELLING,<br><br>        Defendant and Appellant. | A147248<br><br>(San Francisco County<br>Super. Ct. No. 14032274) |

We began a recent opinion with the observation that "[o]ne of the more disconcerting things that can occur at a criminal trial is the discovery that there is no CALCRIM instruction for the offense charged, thus requiring the judge—hopefully with the assistance of counsel—to formulate appropriate instructions from scratch." (*People v. Starski* (2017) 7 Cal.App.5th 215, 218.) That observation is apt here, as there is no CALCRIM instruction for Penal Code section 149,[1] which criminalizes a "public officer who, under color of authority, without lawful necessity, assaults or beats any person . . . ." We went on in *People v. Starski* to hold that the trial court had crafted a jury instruction that properly told the jury the elements of the crime, and we affirmed Starski's conviction. We reach the opposite result here, concluding that the instruction—more accurately, instructions—prepared by the trial court were inaccurate and misleading, allowing the district attorney to present and argue a case on a basis that allowed defendant to be wrongfully convicted. We conclude the error in instructions was prejudicial, and reverse on that ground, without the need to address defendant's other arguments.

---

[1] All undesignated statutory references are to the Penal Code.

# BACKGROUND

## The Setting

San Francisco General Hospital is a renowned safety net hospital, particularly well known for its emergency department. That department has a diverse and unpredictable patient population, much of it consisting of the homeless, the mentally ill, and those suffering from substance abuse problems. The chaotic population can make the emergency department a dangerous place: staff have been strangled, sexually assaulted, punched, kicked, and spit upon. Abuse by patients, both physical and verbal, is a daily, sometimes hourly, occurrence. As a result, patient behavior is tracked in a database provided by the Department of Public Health, so staff can communicate with others to alert them of potentially violent or abusive patients.

This has also resulted in the development of protocols and procedures to protect staff and patients. For example, patients without pending business in the emergency department are not permitted to loiter. People who are sleeping or lingering in the waiting area in the early morning hours without medical necessity are asked to leave. And once they are screened and cleared for discharge, verbally abusive or physically threatening patients are removed.

The emergency department is overseen by armed deputies from the San Francisco Sheriff's Department, who are on the premises 24 hours a day to provide security. During the midnight shift, three officers are on duty, one at a podium just outside the department waiting area, another at a post behind the security doors to the department, and a third on foot patrol around the campus. There is also a dispatcher who monitors security cameras throughout the facility, one of which is pointed at the emergency department waiting room.

According to hospital training and protocols, emergency room nurses are required to rely on the deputies when a disruptive or potentially violent patient is observed. And if requested, the deputies assist the staff with handling potentially violent patients, escorting them out of the emergency department once they are medically cleared. In short, the deputies rely on the staff to decide who should be removed, and the staff rely on the

2

deputies to step in when alerted to a potentially dangerous patient.  Generally speaking, on a nightly basis several people are escorted off campus for verbally or physically abusing the staff or other patients.

On November 3, 2014, the sheriff's deputy on duty at the podium was defendant Michael Lewelling.

### Fernando Guanill Arrives at the Emergency Department

At 3:27 a.m. on that date, Fernando Guanill walked in through the main emergency department entrance.  Guanill was 60 years old, about five feet, seven inches tall, and weighed approximately 140 pounds.  He was on disability and received social security income due to a disability with his left leg.  He was homeless, and had been for approximately three and a half years.  Guanill had a 9:00 a.m. appointment at an orthopedic trauma unit, but decided to go to the hospital early in the hope he could get some pain medication before the appointment.  He was in extreme pain—10 out of 10.

Guanill had been seeing Dr. Yee-Bun Benjamin Lui at the Chinatown Public Health Center as his primary care physician for some two and a half years.  During that time, Guanill had various encounters with the staff at the health center, and Dr. Lui had Guanill sign a behavior contact under which Guanill agreed not to use demeaning language, insulting terms, or foul language when speaking to staff.  Guanill also agreed to a pain contract, under which only Dr. Lui could prescribe narcotics to him, and using opiates outside of what Dr. Lui prescribed would be a violation of the contract.  Guanill took pain medication such as Percocet, Naproxen, and Nortriptyline, for which he got prescriptions once a month.  He also tried to manage his pain with alcohol, often with bad results.  As Guanill himself put it, this affected the way he interacted with other people: usually when under the influence he became louder; and when the pain got really bad he automatically raised his voice.[2]

---

[2] San Francisco Police Officer Jesse Heredia described Guanill as a habitual drunk, constantly belligerent, and very combative.  Guanill had thrown an alcoholic beverage container at him, had attacked Heredia's partner, and had resisted arrest and verbally abused officers while they tried to restrain him.  San Francisco Police Officer

3

Tim Coyle was working the examination room as a triage nurse. Coyle asked Guanill if he needed to see a doctor. Guanill responded, in a verbally abusive manner, that he was checking in for his appointment, though reluctant to give Coyle any information about it. Coyle checked Guanill's chart and noted that his appointment was later that morning. He also noted that Guanill's chart contained numerous behavioral alerts, including aggressiveness, assaultive behavior, and narcotic-seeking behavior, and that he had a pain contract.

Coyle tried to encourage Guanill to attend his appointment instead of being admitted to the emergency department, explaining that Guanill did not need to check in. Guanill responded he wanted a prescription for Oxycodone. Coyle told Guanill emergency doctors did not treat chronic pain by writing prescriptions, and advised Guanill to see his doctor at his appointment later in the day, additionally reminding Guanill that he had a pain contract.

While it appeared to Coyle that Guanill was at the emergency department to acquire opiates, Coyle nevertheless medically screened Guanill, and asked if there were any changes in the condition of his wound. This question made Guanill even more agitated and angry, to the point Coyle felt threatened by Guanill's behavior, as he became tense and started cursing and calling Coyle profane names. Coyle asked Guanill to take a seat in the waiting room. There, Guanill continued being abusive and uncooperative and cursing under his breath.

Coyle told nurse Laura Bandura that he had examined Guanill, informing her about Guanill's aggressive and hostile behavior, and advising that she should not triage Guanill by herself and not bring him behind the closed doors of the triage.

_____

Christopher Ritter arrested Guanill for drinking in a public place and threatening police officers with a knife. American Medical Response paramedic Kenneth Deroque testified that when he and his partner responded to a call in North Beach, Guanill was aggressive and abusive, and spit on Deroque. Another EMT who treated Guanill for the injuries to his face testified that Guanill was verbally abusive, and threw a bloody gauze the EMTs were using to clean his wounds.

4

Shortly thereafter, Guanill was called by the registration staff and asked to sign some forms that were part of the admission process. Agitated and upset, Guanill continued to interact negatively with the staff, acting disruptively, walking back and forth, and talking very loudly, continuing in this fashion for several minutes. Guanill was registered, after which he sat down and was quiet for a few minutes, but soon started talking out loud, ranting, raving, and waving his cane. Eventually, Guanill went back to the waiting area and fell asleep on a bench.

Coyle spoke to nurses Bandura and Valarie Bochenek about Guanill's abusive behavior, after which Bochenek went to observe Guanill, who appeared to be asleep.

**Defendant Intervenes**

The three nurses collectively decided to follow department policy and have Guanill escorted out of the waiting room. Bochenek went to defendant and told him Guanill was being abusive towards Coyle and the registration staff, and needed to be escorted out of the waiting room for safety reasons.

Defendant approached Guanill, who was still sleeping in the same position. No one else was in the waiting room at the time. Defendant approached Guanill from behind, and stood on his right side in a "bladed stance," such that his gun was as far as possible from Guanill. Defendant tried to wake Guanill verbally, without success. He then woke him by tapping him on his right shoulder. Defendant told Guanill he had to leave and come back later, pointing to the exits.

Coyle, testifying for the People, heard something that drew his attention, and described what he saw when he looked over: "Mr. Guanill was seated with his back on the chair, kind of turned to the side, with his hand on his cane. And Deputy Lewelling was in front of him and trying to take the cane away, or his hand was on the cane, too." Prosecution witness Karen Jones, an eligibility worker in the department, described what she saw this way: Guanill was shouting, "you can't take my cane. I need my cane.

I need it to walk with. I'm disabled."[3] Defendant tried to put handcuffs on Guanill, and matters deteriorated from that point: Guanill verbally and physically resisted, the officers used additional force, and eventually they placed him under arrest.

Deputy Sheriff Brandon Kutches investigated the case that led to the charges against defendant, an investigation that actually began as a criminal case defendant had initiated against Guanill. Kutches conducted a number of interviews, including one with Guanill on November 25. Initially, Guanill did not tell Kutches that he had been beaten or choked. Guanill understood defendant had been asked to have Guanill removed, and recalled that he was awakened by defendant who was " 'demanding and forceful' " and telling him "to get . . . out." Guanill denied making any threats to defendant or resisting arrest.

**The Expert Testimony**

The prosecution put on no expert testimony in its case in chief.

Testifying for defendant, Napa Valley College professor of criminal justice Sean McCann testified that the techniques and approaches defendant used were sound. Defendant's approach to Guanill from behind instead of the front was reasonable, as walking up in front of an aggressive subject seated in a chair could subject one to potential assault. According to McCann, since Guanill already had mobility issues, immobilizing him in the chair was a sound decision. The cane that comes up in defendant's view can be treated as a potential weapon, and an officer should remove it as soon as possible. Using the reasonable officer standard, defendant's reaction to the cane was appropriate and an attempt to remove it showed that defendant was resolving the situation appropriately. In sum, McCann's expert opinion was that everything defendant did was consistent with professional industry standards—and reasonable.

---

[3] Guanill's version of events was essentially as follows: He told defendant, "I can't walk." Then he picked up his cane and slowly got up, leaving his belongings. He went to the closest exit to his left. He did not think about his belongings. He wanted to avoid the hostility. Then he got punched, he was being choked, and he was frightened for his life.

6

San Francisco Sheriff's Sergeant Daniel Rosen, who reviewed defendant's report, testified on rebuttal for the People. Concerning the interaction with Guanill, Rosen agreed that defendant's approach to Guanill, the bladed stance, the tap on Guanill's shoulder, were reasonable. Rosen testified that even if a patient verbally abuses the officer, at the same time complying with the request to leave, there is no justification for grabbing the patient by the back of the collar and arm, and that choking was not an appropriate use of force in the situation. However, Rosen agreed that defendant's use of force to overcome Guanill's resistance to being handcuffed was reasonable, that considering Guanill was resisting lawful arrest, the force used was appropriate. And he agreed that the strikes to Guanill that appeared on the videotape after the initial detention were "appropriate uses of force, if there hadn't been an improper detention or previous interaction."[4]

## THE PROCEEDINGS BELOW

### The Charges

In May 2015, defendant was charged by information with five felonies: count 1—assault by a public officer (Pen. Code, § 149); count 2—filing a false or forged instrument (§ 115, subd. (a)); count 3—perjury (§ 118, subd. (a)); count 4—filing a false report (§ 118.1); and count 5—assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)).

---

[4] This was Rosen's specific testimony:

"Q. Your fundamental assumption that led to your opinion on this case is that Mr. Guanill was getting ready to leave the hospital, correct?

"A. Yes.

"Q. And that is what led to your opinion that the force was excessive, right?

"A. Yes.

"Q. So, in fact, you conclude your report by opining . . . that the strikes, including the elbow strikes and the palm strikes at the end of the video, are appropriate uses of force, if there hadn't been an improper detention or previous interaction, correct?

"A. Yes."

7

Section 149, the basis on which defendant was convicted, is in Title 7 of the Penal Code, entitled "Other Offenses Against Public Justice," a chapter enacted in 1872. Section 149 provides in its entirety as follows: "Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment." Witkin's discussion of section 149 describes it as "**Assault By Public Officer**." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 56, p. 847.)

As best we can determine, in the 145 years that section 149 has been on the books, there have been a total of four published opinions addressing it. Not one of them deals with any instruction issue. And not one with the phrase "without lawful necessity."[5]

At the same time the Legislature enacted section 149, it also enacted section 146, the terms of which were to become implicated here. We thus quote that section as well: "Every public officer . . . who, under the pretense or color of any process or other legal authority, does any of the following, without a regular process or other lawful authority, is guilty of a misdemeanor: [¶] (a) Arrests any person or detains that person against his or her will." Witkin describes this section as "misdemeanors deal[ing] with unlawful restraints." (1 Witkin & Epstein, *supra*, § 274, p. 1101.)

**The Bill of Particulars**

Prior to trial, defendant moved for a bill of particulars, claiming it was impossible from the information to understand the theory of the section 149 charge. A hearing was held, at which the court confirmed defendant's position, that "the defense is unclear of what specific acts constitute each count." The court then asked the prosecutor for her

---

[5] That said, in *People v. Mehserle* (2012) 206 Cal.App.4th 1125, the notorious case involving the death of Oscar Grant at a BART station, our colleagues in Division One noted that there "the trial court instructed the jury that it could find defendant guilty of violating section 149 if, while arresting Grant, he used 'more force than was necessary under the circumstances.' " (*People v. Mehserle, supra,* at p. 1140.) And as to this, the court said it saw "no error." (*Id.* at p. 1156, fn. 20.)

8

response, which began as follows:  "the People's broad response to it is that Deputy Lewelling's . . . actions at the very inception were illegal, and therefore, everything that flows from it was illegal."  The court said, "So you're saying that those first acts were illegal?"  The prosecutor responded, "Correct.  The initial touch, which is grabbing him by the back of the collar as he's walking away from the defendant.  And so everything else after that is illegal as well."  As the prosecutor would later come to describe it, section "149 is a 146 plus force."

As will be seen, that was the prosecution's position throughout, from the hearing on the bill of particulars through closing argument.

**The Proposed Instructions**

As noted, there is no CALCRIM instruction for section 149, and both the prosecution and defendant proposed special instructions.  The prosecution filed her proposed jury instructions on July 21, 2015.  "Special Instruction 1 (Count 1)" addressed the section 149 charge.  There was no definition of "without lawful necessity."  Defendant's proposed instructions were filed the same day.  His proposed instructions defined "without lawful necessity" as follows:  "In order to prove that defendant acted without legal necessity, the People must prove beyond a reasonable doubt that the defendant used more force than was necessary under the circumstances."

While the prosecution's proposed special instruction contained no express definition of the phase "without lawful necessity," the instruction included a lengthy, two and a half page instruction that the district attorney would later explain was a modification of CALCRIM No. 2670.  That instruction, entitled "Lawful Performance: Peace Officer," describes circumstances in which a police officer is "not lawfully performing his or her duties," and explains the circumstances in which a police officer can lawfully detain and arrest a citizen, including descriptions of reasonable suspicion and probable cause.  As will be discussed in detail below, the court included this lengthy exposition in its instruction here.

On July 29, the defense rested, following which the court met with counsel concerning remaining instruction issues.  The only instruction discussed involved the

9

"149" charge. Counsel for defendant objected to the People's proposed instruction, and at one point, the court asked the prosecutor, "Why does the Court have to go beyond the language of the statute?"

The People presented a brief rebuttal, and rested, following which the court and counsel went "through jury instructions." At one point the court asked if "we need an instruction that . . . a detention needs reasonable cause and arrest needs probable cause?" The prosecutor responded "that is in the lawful performance instruction." "It's 2670." That day, the instructions were "memorialized on the record."

**The Closing Argument**

Against the background of those settled instructions, the prosecutor argued the theory of liability that had been articulated at the hearing on the bill of particulars—if there was no basis for an arrest, any touching was a violation of section 149. This is how the argument began: "Mr. Guanill spent a long time in the waiting room at the emergency department before this happened. He was asleep for half an hour before Deputy Lewelling approached him, woke him, told him to leave the emergency room, and then assaulted him. According to his authority, he assaulted him without cause, without lawful authority, and he assaulted him with great force." "[L]awful authority," of course, is not the language in section 149. It is the language used by section 146, the unlawful detention statute.

From there, the prosecutor went on for several pages focused on Guanill's conduct leading up to the detention, a predicate for the claim that the detention itself was unjustified. Only once in her argument did she refer to "without lawful necessity," only in her mention of the element of the charged crime. Doing so, she urged the exact definition the court later gave, that "without lawful necessity" is tied to the question whether an officer's decision to detain is justified by facts amounting to reasonable suspicion.[6] But in doing so, the prosecutor again used the word "authority," this time

---

[6] This was the sole reference: "Now, assault by a peace officer has these four elements. Defendant was a peace officer at the time of the conduct. He was acting under color of authority. He assaulted or beat another person. And then he acted without legal

10

changing the phrase to "legal authority," again the term in section 146 but not section 149.

Turning briefly to what she described as the critical element in section 149, the prosecutor argued that the question was "whether or not Mr. Lewelling acted with proper legal authority in order to do that to Mr. Guanill." The prosecutor then described the grounds for a valid detention (reasonable suspicion) and arrest (probable cause), thus tethering the essential concept—"legal necessity"—to the question whether defendant had a legally reasonable basis to arrest Guanill. And she argued, "It's kind of like a little law school primer about reasonable suspicion to make a detention. And there's a definition for it. It's that there's specific facts known, apparent to the officer, that lead him to suspect that Mr. Guanill is about to be involved in an activity relating to crime. And then there's probable cause to make arrest. [¶] That's probably more than you actually get, you know, watching TV or legal dramas. But it's facts known to the arresting officer at the time of the arrest that will persuade someone of reasonable caution that the person to be arrested has committed a crime."

And from there the prosecutor argued her theory of guilt: "Now, what you have to do is go back to the beginning. Go back to the first point of contact. Because if that's illegal, then everything else is unlawful. Ask yourself, did the defendant have a reason to use force on Mr. Guanill." The prosecutor then tied that theory in Sergeant Rosen's opinion—that the unreasonable use of force was in the initial detention. Thus: "And think back to Sergeant Rosen's testimony yesterday. He said under a number of hypotheticals, is it reasonable to use force in this situation, where he's getting up and he's moving toward an exit when you ordered him to leave? Is it reasonable to use force upon him if he said, 'I'm going to talk to the nurses,' but he's getting up and leaving. Is it reasonable to use force upon him if he says something rude like 'If you touch me, I'll fuck you up.' And Sergeant Rosen said, no. I mean, he might get the last word, but he's

necessity. [¶] I think Mr. Stern [counsel for defendant] will agree that the first three are without contention, but it's whether or not Mr. Lewelling acted with proper legal authority in order to do that to Mr. Guanill. [¶] So you'll get some instructions. . . ."

11

doing exactly what he's been told. He's getting up and leaving. He's complying with the defendant's order. He hasn't done anything wrong except for maybe contempt of cop. And that means that the defendant did not have grounds to detain, did not have grounds to arrest."

The next page was similar: "And how much time does it take for Deputy Lewelling to go ahead and go hands on? One step. Mr. Guanill gets one step before he's thrown back down into that chair. One step is all you get in San Francisco General Hospital. [¶] The force is not reasonable." The prosecutor continued, emphasizing that if the jurors "determine that the defendant does not have a lawful justification for the force that he used on Mr. Guanill," they should convict. And so the prosecutor concluded: "So in terms of Count 5, if you determine that the defendant does not have a lawful justification for the force that he used on Mr. Guanill, you go to Count 5. And this is the definition of an assault, lots of words there. In the absence of some lawful justification, this is an assault," making the point as plainly and forcefully as she could possibly have done: in light of the unjustified detention, defendant "had no reason to use any type of force on Mr. Guanill."

This argument—which urges conviction not based on the use of too much force, but because defendant used any force without justification—is identical to the prosecutor's description of her theory at the start of the case; it is consistent with the opinions of her use-of-force expert Rosen; and, as will be seen, it is identical to her description of her theory as she admitted in the post-trial proceedings: section "149 is a 146 plus force."

**The Instructions**

The trial court first defined the elements of section 149 this way: "A police officer acting under color of authority and without lawful necessity who assaults or beats any person is guilty of a crime. In order to prove this crime, the People must establish each of the following elements beyond a reasonable doubt: [¶] One, the defendant was a peace officer at the time of the conduct. [¶] Two, the defendant was acting under color of

authority. [¶] Three, the defendant assaulted or beat another person. [¶] Four, the defendant acted without legal necessity."

The instruction next told the jurors that "Assault is defined in another instruction. Legal necessity is defined in another instruction. Both of those follow this instruction."[7]

The instruction continued:

"In order to prove that the defendant acted without legal necessity, the People must prove beyond a reasonable doubt that the defendant used more force than was necessary under the circumstances.

"A police officer may use reasonable force to arrest or detain a person, to prevent escape, or to overcome resistance when he has reasonable cause to believe the person has committed a crime.

"In deciding whether the defendant used unreasonable or excessive force, you must determine the amount of force that would have appeared reasonable to a police officer in defendant's position, under the same or similar circumstances.

"A police officer who detains or who makes or attempts to make an arrest is not required to retreat or cease from his efforts because of the resistance or threatened resistance of the person being arrested.

"The reasonableness inquiry is an objective one. The question is whether an officer's actions are objectively reasonable, in light of all the facts and circumstances confronting him, without regard to his underlying intent or motivation. Evil intentions will not make a crime out of an objectively reasonable use of force, and good intentions will not make an unreasonable use of force proper."

The court then instructed the jurors, the first of three times, on the meaning of assault, including that "The People are not required to prove that the defendant actually touched anyone. The People are not required to prove that the defendant actually

---

[7] In written instructions the jurors took into the jury room, this sentence was more explicit: "Legal necessity is defined in instruction number 2670, which follows this instruction." The court later made the same point orally: "Instruction . . . 2670, explains when an arrest or detention is unlawful and when a force is unreasonable or excessive."

13

intended to use force against someone when he acted. No one needs to actually have been injured by the defendant's act."

Finally, the court instructed the jurors using a modified version of CALCRIM No. 2670 which, in both its oral instructions and in the written instructions later furnished the jury, explained would provide a definition of the key phrase "legal necessity":

"The People have the burden of proving beyond a reasonable doubt that the defendant was not lawfully performing his duties as a peace officer. If the People have not met this burden, you must find the defendant not guilty of Counts 1 and 5. A peace officer is not lawfully performing his duties if he is unlawfully arresting or detaining someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention.

"An unlawful detention. A peace officer may legally detain someone if, one, specific facts known or apparent to the officer lead him to suspect that Fernando Guanill is or is about to be involved in activity related to a crime. And, two, a reasonable officer who knew the same facts would have the same suspicion. Any other detention is unlawful.

"In deciding whether detention was lawful, consider the evidence of the officer's training and experience and all the circumstances known by the officer when he or she detained the person.

"B, unlawful arrest. A peace officer may legally arrest someone if he or she has probable cause to make the arrest. Any other arrest is unlawful. Probable cause exists when the facts known to the arresting officer at the time of the arrest would persuade someone of reasonable caution that the person to be arrested has committed a crime. In deciding whether the arrest was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested Fernando Guanill.

"C, use of force. Special rules control the use of force. A peace officer may use a reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense."

14

The court next instructed the jurors on the elements of the "charges that Deputy Lewelling arrested Mr. Guanill on," which included trespass, resisting arrest, preventing an executive officer from performing his or her duty, and assault on a police officer. And during these several pages of instruction, the court three more times instructed the jury that the question was whether defendant was a "peace officer . . . lawfully performing his duties. . . ."[8]

**The Deliberations and the Verdict**

The jury began its deliberations on the afternoon of July 30. They deliberated all the next day, July 31. On August 3, the jury sent this question to the court: "Can you clarify what Section 240 is? It seems like a discrepancy with the code listed on Count 1 (Section 149)."

The next day, August 4, following discussion with counsel, the court delivered this answer:

"Simple assault, Penal Code section 240, is referenced in two counts: Counts 1 and 5. It is also referenced on page 31 in your instruction on Assault on a Peace Officer.

"As to Assault on a Peace Officer, as described on page 31, the assault does not require an actual touching.

"Simple Assault, jury instruction number 915, page 25, defines assault in the jury instruction on page 24, Count 1 Assault by a Public Officer (Penal Code section 149). You also need to consider jury instruction number 2670, pages 26–27, Lawful Performance of a Peace Officer. These three instructions should be read together. Simple Assault is an element of the offense as charged in Count 1, not a lesser included offense.

---

[8] The first two were in the context of instruction on section 148, where the court told the jurors, "A peace officer is not lawfully performing his duties or her duties if he is or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties." The third was in the context of section 69 instruction: "A peace officer is not lawfully performing his or her duties if he is unlawfully arresting or detaining someone or using unreasonable or excessive force in his duties."

15

"Simple Assault, jury instruction 915, page 40, is a lesser included offense of Count 5, Assault with Force Likely to Produce Great Bodily Injury, pages 36–37."

Later, on August 4, the jury sent a note to the court that asked, "To clarify, should this read 'Section 240' or 'Section 149' as it says on page 24 of the Instructions?" The court's response said, "The verdict form is correct."

The jury returned its verdicts on the afternoon of August 4 finding defendant guilty of count 1, violation of section 149, and also guilty of misdemeanor violation of section 240, a lesser offense to count 5.[9] The jury found defendant not guilty on the other three charges. As best we can tell, the jury deliberated over three and a half days.

**Defendant Moves for New Trial**

In December 2015, defendant moved for judgment of acquittal or new trial, set for hearing on January 6, 2016. The People filed opposition, defendant a reply, and the motion came on for hearing. Defendant's attorney began by recognizing the difficulties in prevailing in the usual new trial situation. However, he went on, "This is one in which I expect to prevail, and that is because more or less the parties are not in disagreement about the underlying question. More or less the parties are not in disagreement about the underlying circumstances and the way the district attorney proceeded in the case and the way Your Honor instructed the jury.

"So the question is whether those instructions and arguments which follow them are correct. And I think that our papers are just very, very clear that they are not correct.

"In my reply papers, I asked Your Honor to ask the district attorney a question. And that question is really simple. Is an unjustified, meaning—unjustified detention a detention without reasonable suspicious [*sic*] plus any force a violation of 149. And we don't need to get to the answer to that question because the district attorney actually answered the question in her sentencing memorandum, and she said yes.

---

[9] The district attorney later conceded the lesser included assault count should be dismissed, and the court did so.

16

"She told the Court, the standards by which the defendant's conduct was measured, that is reasonableness, did he have reasonable suspicion to detain, and did he use reasonable force. So she has said that the question of reasonable suspicion is part of the lawful—the lawful necessity and calculus. And as we make clear in our papers, that's just absolutely wrong. It can't be true because of the way the statutes are interpreted because of a 146, because of all the reasons we've set forth.

"And then the question is whether the Court allowed the jury to convict Mr. Lewelling of 149 on that theory."

Defendant's attorney went on for several pages with specific reference to the court's instructions, and then concluded as follows: "So the combination of the instructions and the argument is absolutely clear what the argument here was. And of course, that was the only argument she had, because her expert told the jury the only reason this was a bad interaction was because of that initial—that initial detention, which was, in his view, unreasonable, unnecessary, unjustified, without cause. He credited the rest of the interaction. He said if that detention is good, everything else was fine."

The prosecutor's response was brief indeed, barely over two pages. After a short introduction, the prosecutor said this: "The reason police officers get to touch people without it being an assault or a battery is because they are lawfully performing their duties. And so, in terms of what Mr. Shaffer [defendant's attorney] said, that is the People's legal theory. Yes, if you do not have a legal detention, if you do not have a legal arrest, you don't get to walk up to somebody on the street and grab them, put your hands on them or touch them. . . . [¶] [T]he People's [theory] is in accordance with the law. And to say that what the defendant did was merely a 146, which is an illegal arrest or illegal detention simply ignores the fact that he put his hands on him; that he assaulted him; that he forced him into a chair.

"So, there are many ways a peace officer can effect an illegal detention or an illegal arrest without the use of force. 149 is a 146 plus force. A police officer could say stop. That is a detention. A police officer could use a siren to effect a detention. And that is not force upon a person. But what we have here is that combination.

17

"And I don't think it's a mischaracterization for [defendant's attorney] to say that. I think that's exactly how the People proceeded."

In sum, the prosecutor's position was that there need not be unreasonable or excessive force. No, an unlawful detention plus any touching violated section 149.

Responding to the arguments, the trial court made clear it understood how the case had been presented, argued, and instructed, and thus how defendant had been convicted. In the court's words, "The video shows that the victim is walking away towards an exit after the defendant told him to leave. The defendant grabs the victim and pushes him down in the seat. No evidence was presented regarding the reasonableness of the defendant's action.[10] After all, if the defendant was concerned that the victim was walking towards the nurse's station that is also in the direction of an exit, the defendant could merely have told him to stop. There was no reasonable basis for *any force*." (Italics added.)

The trial court went on to deny the motion without reaching the merits, ruling that defendant's claim had been forfeited. In the court's words: "[T]he defense attributes the blame to the Court as it must because the record is devoid of his objections to that which he most strenuously objects today. [¶] . . . [¶] The DA's argument is built around, according to the defense, her erroneous theory of the case culminating in her closing argument. The Court searched the record, all eight volumes. The defense did not object to the Court's instruction 2670, and nowhere does the defense object to this aspect of the DA's closing argument, nor the theory that the defendant claims she built upon from the very beginning of the trial. [¶] . . . [¶] The Court does not agree that prejudice occurred. But assuming for a moment the prejudice resulted from this tripart fusion, the error does not rest with the Court. The defendant is not excused from making timely objections so that the Court is made aware at the soonest opportunity that prejudice may be occurring and has an opportunity to cure it."

---

[10] This was not accurate, as Professor McCann testified as set forth above.

18

We digress momentarily from the chronology to note that the trial court's reliance on forfeiture is interesting, in light of the prosecutor's own position below. Not only did the prosecutor not argue forfeiture, but in her opposition to the new trial motion said that "To the extent that Defendant's motions are questions of law that implicate his substantial rights, the People agree that it is proper for the Court to pass on the matters at hand."

The court denied the motion for new trial and dismissed the misdemeanor assault conviction. As to the conviction for section 149, the court suspended imposition of sentence and placed defendant on three years' probation.

Defendant filed a timely notice of appeal.

## REVIEW

**Introduction**

Defendant's appeal has three arguments: first, the jury instructions misstated the elements of section 149 which, in light of the prosecution's argument, permitted an improper conviction; second, section 149 is void for vagueness, both facially and as applied; and third, the evidence is insufficient to sustain the conviction.

Elaborating, defendant's first argument is that the instructions on the fundamental element of the offense—"without lawful necessity"—were clearly erroneous, with the result that the jury was allowed to reach an improper verdict. The argument is lengthy, and has four components, all discussed in detail: (1) on no fewer than four separate occasions (and perhaps as many as seven) the court directed the jurors to CALCRIM No. 2670 to define "without lawful necessity," which expressly permitted the jurors to find that the prosecutor proved that element if defendant carried out an unjustified detention; (2) the court referred the jurors to the incorrect instruction in its response to the jury question in the midst of deliberations; (3) the evidence, including most importantly, the expert testimony by both sides, was susceptible only to the conclusion that defendant's use of force in carrying out the detention was not excessive; and (4) the prosecutor's closing argument focused the jurors over and over again on precisely the invalid theory of guilt that was permitted by the trial court's repeated misinstruction.

19

The Attorney General's brief does not meaningfully respond to defendant's primary argument, her fundamental contention being that the instructions properly stated the elements of section 149. Doing so, the Attorney General glosses over most of the instructions, for example stating that the trial court gave the instruction "furnished by the defense, adding references to instructions 915 and 2670 . . . ." However, the "references to . . . 2670" are never discussed, its essence never quoted—this, despite that 2670 is at the heart of the problem. Along the same lines, the Attorney General quotes the prosecutor's one reference to " 'used more force than was necessary under the circumstance,' " and then notes that " '[t]his requirement was not altered by the subsequent instructions,' " an assertion made without anything more. And as to the prosecutor's closing argument that is also at the heart of defendant's argument, the Attorney General's brief ignores almost all of it—and meaningfully addresses none of it.[11]

All this will be described in detail below. But we begin with the Attorney General's argument that the instruction issue has been forfeited.

### Defendant's Claim Was Not Forfeited

Defendant's opening brief addressed the trial court's forfeiture holding head on, with four separate arguments. The first pointed to the district attorney's concession below, to the extent the claim of instructional error implicated defendant's substantial rights, the court should address the merits of the claim. The second contended that as the parties submitted competing instructions, and the court sided with the district attorney, no further objection as to the contents of the instruction was required. The third contended that a trial court must properly instruct even without request on the general principles of law governing the case, which obligation is sua sponte, the effect of which is that absence of a formal objection cannot forfeit the claim. And the fourth contended that section

---

[11] After quoting 11 lines from the district attorney's argument, and two pages later, citing the same few lines, the Attorney General's brief says that "a fair reading of the argument set out a requirement that [defendant] used unreasonable force."

20

1259 allows this court to review instructional error that impacts the substantial rights of the defendant without regard for any objection.

The Attorney General's argument for forfeiture consists of some eight lines, in two passages. The first is this short paragraph: "[Defendant] provided most of the language in the instruction and did not claim error in the court's reference to other instructions. A defendant may not contend on appeal that jury instructions are impermissibly ambiguous without first requesting a clarifying instruction at trial. Failure to make such a request forfeits the claim on appeal (*People v. Hart* (1999) 20 Cal.4th 546, 622.) [Defendant's] claim should be deemed waived." The second is five pages later where, citing *People v. Moon* (2005) 37 Cal.4th 1, 29, the Attorney General argues that defendant forfeited the issue because "he did not request modification or object to the instruction." We reject the argument.

To begin with, a trial court has a sua sponte duty to provide proper instructions on all of the elements of the charged offenses. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311; *People v. Sedeno* (1974) 10 Cal.3d 703, 715.)

Beyond that, section 1259 states that "Upon an appeal taken by the defendant, the appellate court may" "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [instructions regarding elements of crime affect substantial rights and require no objection for appellate review].)

And superimposed on all this is the prosecution's concession, urging the trial court to address the merits. The trial court refused. We do not, and turn to the merits of defendant's claim.

**The Standard of Review**

Defendant asserts that instructional error regarding the elements of a crime "requires reversal . . . unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict," citing to *People v. Chun* (2009) 45 Cal.4th 1172, 1201, *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 64, and *Neder v. United*

21

*States* (1999) 527 U.S. 1, 15. Defendant asserts that the same standard applies in the situation, as here, when the jury is given the option of relying on one of two theories of guilt, one of which is legally correct, the other of which is not, and thus reversal is required unless the record demonstrates beyond a reasonable doubt that the verdict was actually based on a valid ground. (*People v. McDonald* (2015) 238 Cal.App.4th 16, 27.)

Eschewing all reference to the cases cited by defendant, the Attorney General responds that we are to independently examine the instruction "to determine whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction."

Defendant replies that the "reasonable likelihood" test has no application where, as here, the instruction is clearly erroneous or facially incorrect. Quoting federal cases, defendant contends that " 'this court is not required to use the "reasonable likelihood" standard employed for ambiguous jury instructions when the disputed instruction is erroneous on its face.' (*Ho v. Carey,* 332 F.3d 587, 592 (9th Cir. 2003); *accord, e.g., Wade v. Calderon*, 29 F.3d 1312, 1321 (9th Cir. 1994); *Murtishaw v. Woodford*, 255 F.3d 926, 967–968 (9th Cir. 2001)." Defendant goes on to assert that instructions that "permit the jury to 'convict based on legally impermissible grounds' (*Murtishaw*) are 'flatly' or 'clearly' erroneous. In that instance, the reviewing court skips the 'reasonable likelihood' analysis and proceeds to determine whether the clearly erroneous instruction requires reversal under the applicable prejudice standard."

We agree with defendant. But even were we to apply the Attorney General's proposed standard, we conclude there was a reasonable likelihood of an improper verdict here.

**The Instructions Were Misleading—If Not Downright Wrong**

22

As quoted in detail above, reciting the contents of section 149, the first thing the instructions told the jurors was that the "without legal necessity" element[12]—the element the prosecutor tied over and over again in her closing argument to the question whether defendant had lawful authority to detain Guanill—would be "defined in another instruction." Defendant asserts that "That directive was both wrong and badly misleading." We agree on both counts.

The phrase "without legal necessity" does not appear in CALCRIM No. 2670. So, at a minimum, the jurors would have been confused if, as directed, they had turned to CALCRIM No. 2670 in search of language setting forth a definition of "without legal necessity." So, the directive was wrong. Also misleading.

CALCRIM No. 2670 focuses on whether the officer is lawfully performing his or her duties, expressly providing that an officer is "not lawfully performing his duties" if either of two things is true: "[(a)] he is unlawfully arresting or detaining someone *or* [(b)] using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention." (Italics added.) So, the trial court told the jurors, an element of the charged offense could be satisfied with proof of (a) or (b), allowing the jury to accept the "without lawful necessity" element of section 149 pursuant to the district attorney's theory of guilt.

The trial court's instruction that the jurors look to CALCRIM No. 2670 for the definition of "without legal necessity" was also confusing because, in their next breath, the instructions told the jurors that "In order to prove that the defendant acted without legal necessity, the People must prove beyond a reasonable doubt that the defendant used more force than was necessary under the circumstances," which is probably a correct

---

[12] As quoted above, both in its recitation of the statute and its indication that the element would be defined later, the trial court used the phrase "without legal necessity." The actual language in section 149 is "without lawful necessity."

statement of the law.[13] The trial court never again mentioned the "without legal necessity" element.

But when the trial court told the jurors at the start of its instruction on the elements of section 149 that "without legal necessity" would be "defined in another instruction," it did not mean the next instruction. What it meant, as noted, was CALCRIM No. 2670. Indeed, the court made the point expressly in the written instructions it provided to accompany the jury to the jury room: "Legal necessity is defined in instruction number 2670." The CALCRIM numbers were printed on the written instructions, so the jury could not have mistaken the court's directive.

When the jurors asked a question about section 240 (the definition of assault), the court did not refer the jurors to its lone reference to the correct definition of excessive force. Rather, the court sent the jurors back to CALCRIM No. 2670. The court later emphasized the point: "Instruction . . . 2670, explains when an arrest or detention is unlawful and when a force is unreasonable or excessive." And there was no mistaking that when the jurors looked to CALCRIM No. 2670, they would have seen that it expressly allowed the district attorney to satisfy the "without lawful necessity" element simply by proving that defendant carried out an unlawful detention. That directive, in the midst of deliberations, is of particular significance here. (See *People v. Gay* (2008) 42 Cal.4th 1195, 1226; *People v. Thompkins* (1987) 195 Cal.App.3d 244, 252–253.)

In sum, on no fewer than four separate occasions, the court told the jurors they should define an element of the charged crime by reference to CALCRIM No. 2670. And there can be no doubt that CALCRIM No. 2670 expressly permitted the jurors to conclude that the prosecution had satisfied that element of the charged offense by proving that a police officer detains without proper cause: "A peace officer is not lawfully performing his duties if he is unlawfully arresting or detaining someone *or* using

---

[13] See fn. 5, *ante*, and *People v. Mehserle, supra,* 206 Cal.App.4th at pp. 1140, 1156. The Attorney General relies on this single statement by the trial court to argue that the jurors were properly instructed, and could not have been misled by the other instructions, viewed in light of the prosecutor's closing argument.

unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention." (Italics added.)

Indeed, the instruction went on to specifically tie that definition to Guanill's detention: "An unlawful detention. A peace officer may legally detain someone if, one, specific facts known or apparent to the officer lead him to suspect that Fernando Guanill is or is about to be involved in activity related to a crime. And, two, a reasonable officer who knew the same facts would have the same suspicion. Any other detention is unlawful." That was in the reporter's transcript.

Three pages later, there was more of the same, emphasizing that jurors look to CALCRIM No. 2670 for the meaning of "unlawful." Five paragraphs later this was repeated verbatim. These instructions accompanied the jury to the jury room. And all this was exacerbated by the court's response to the jury's question, directing the jury in the midst of deliberations to the very same—and inappropriate—instruction.

Superimposed on this error was the prosecutor's closing argument, quoted in detail above, every aspect of which argument was consistent with its theory of guilt. Such argument compounded the error. (See, for example, *People v. Morgan* (2007) 42 Cal.4th 593 [legally inadequate theory can occur through the prosecutor's argument, when combined with instructions which could be susceptible to the same interpretation].)

In addition to all the above, defendant contends there are five other reasons demonstrating that section 149 cannot justify the conviction here. Two are worth mentioning.

The first is that section 146 expressly covers detention "without . . . lawful authority," so interpreting section 149 to cover the same conduct is illogical. As defendant asserts, sections 146 and 149 were passed together in 1872, part of a statutory scheme applying to the conduct of police officers. Section 146 applies to the district attorney's theory here, making illegal the detention of any person by a police officer "without . . . lawful authority." Violation of section 146 is a misdemeanor.

To conclude that section 149 should also be read to cover such conduct would bump up against a fundamental rule of construction, that statutes passed as part of a

25

single statutory scheme should be harmonized if possible. To put it slightly differently, to read the statute to cover the same conduct would not only make little sense, it would penalize unlawful detention under one statute as a misdemeanor, and under the other as a felony.

The second is that parallel civil instructions are contrary to the prosecution's theory. That is, CACI No. 3020, entitled "Excessive Use of Force—Unreasonable Arrest or Other Seizure—Essential Factual Elements," provides that to prevail on an "excessive force" case, plaintiff must prove among other things that defendant used force that was "excessive," and that defendant "was acting or purporting to act in the performance of [his/her] official duties." In short, for a peace officer to be liable in tort, he or she must use "excessive force." So, defendant would not be liable in tort under the prosecution's theory here, but the instructions allowed defendant to be convicted of a crime—an anomalous conclusion to be sure.

The Attorney General contends that even assuming the trial court erred in the inclusion of CALCRIM No. 2670, any error was harmless, citing to *People v. Watson* (1956) 46 Cal.2d 818, 836 and *People v. McCaskey* (1989) 207 Cal.App.3d 248, 259. The Attorney General addresses its no prejudice claim in a single paragraph, concluding that "the video evidence establishing that [defendant] grabbed the victim and pushed him, coupled with the instructions permitting reasonable force, render any error harmless." We disagree.

Numerous cases have held that giving instructions that are contradictory or so inconsistent to confuse the jury was reversible error. (See, for example, *People v. Baker* (1954) 42 Cal.2d 550, 567 [instruction on insanity and presumption were "confused, contradictory, and ambiguous"]; *People v. Dail* (1943) 22 Cal.2d 642, 653 [contradictory accomplice instructions; "Inconsistent instructions have frequently been held to constitute reversible error where it was impossible to tell which of the conflicting rules was followed by the jury"]; *People v. Jeter* (2005) 125 Cal.App.4th 1212, 1217–1218 [conflicting instructions on assault with deadly weapons].)

26

The instructions here were at the least confusing, shown, for example, by the fact that the jurors twice asked specific questions that were at the heart of the issue.

As Witkin describes it, "Misstatement of the law concerning the elements of the offense or the defenses available to the accused is of course serious error. Reversal is usually grounded on a number of these misstatements, or on erroneous instructions coupled with other errors, where the evidence is in substantial conflict." However, following citation and distillation of numerous cases, the author goes on, "Occasionally, in a close case, a single erroneous instruction on a vital element or defense is reversible error. [Citations.]" (5 Witkin & Epstein, Criminal Law (4th ed. 2012) Trial, § 748, pp. 1166–1167.) Such reversible error is present here.

This, it cannot be gainsaid, was a close case, the jury deliberating for what appears to be the better part of four days.

That this was a close case is also shown by the fact that the jurors rejected the false reporting and perjury counts, which were based on the prosecution's theory that, contrary to the assertions in defendant's report, Guanill never threatened defendant with his cane or told defendant " 'I'll fuck you up if you touch me.' " In light of these acquittals, there is reason to believe the jurors concluded Guanill did threaten defendant with his cane and with physical violence. Those facts further support both experts' conclusion that defendant's conduct after the initial detention was reasonable, which means the jurors must have relied on the prosecution's invalid theory of unlawful detention to convict defendant under section 149.

Finally, we note that when the jurors posed a question about an apparent conflict between the simple assault charge and the section 149 charge, among other things, the court's response told the jurors, "You also need to consider jury instruction number 2670, pages 26–27, Lawful Performance of a Peace Officer. These three instructions should be read together." That response again focused the jurors on the erroneous "lawful performance" rules which, as the court had erroneously informed the jurors in its oral and written instructions, should be used to define the phrase "legal necessity" under section 149.

27

Because of the result we reach, we need not address defendant's arguments that section 149 is void for vagueness or that the evidence is legally insufficient to sustain the conviction.

## DISPOSITION

The judgment of conviction is reversed.

                                    _____\
                                    Richman, J.

We concur:

_____\
Kline, P.J.


_____\
Miller, J.

A147248: *P. v. Lewelling*

Trial Court:   San Francisco County Superior Court

Trial Judge:   Hon. Ellen Chaitlin

Counsel:

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano and Aileen Bunney, Deputy Attorneys General for Plaintiff and Respondent.

Kerley Schaffer, Dylan Leon Schaffer, Jesse Suarez; Rains Lucia Stern, Harry Sandel Stern for Defendant and Appellant.